UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. LARRY OWENS, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | No. 08 C 7159 |
| GERARDO ACEVEDO, Warden, Hill Correctional Center, | ) ) ) | The Honorable Rebecca R. Pallmeyer, |
| Respondent. | ) | Judge Presiding. |

### ANSWER

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, and this Court's March 10, 2010 order, respondent GERARDO ACEVEDO, Warden of Hill Correctional Center, answers the instant Petition for a Writ of Habeas Corpus as follows:

### Statement of the Case

Petitioner, Larry Owens, identified as prisoner number R02021, is incarcerated at Hill Correctional Center in Galesburg, Illinois, where he is in the custody of the warden of that facility, Gerardo Acevedo.

On November 8, 2000, following a bench trial in the Circuit Court of Cook County, petitioner was convicted of first degree murder for beating Ramon Nelson to death with a baseball bat outside a liquor store in Markham, Illinois. (Resp. Exh. D, Order in *People v. Owens*, No. 1-01-0341 (Ill.App. Dec. 4, 2002)). Petitioner was subsequently sentenced to a twenty-five-year prison term. (*Id.*).

Petitioner appealed, and the Illinois Appellate Court, First District, affirmed the judgment. (*Id.*). On April 2, 2003, the Illinois Supreme Court denied leave to appeal (PLA). (Resp. Exh. F, Order denying PLA in *People v. Owens*, No. 95534, 788 N.E.2d 733 (Table) (Ill. 2003)). Petitioner states that he did not file a petition for certiorari. (Pet. at 2).

On September 10, 2003, petitioner filed a pro se postconviction petition pursuant to 725 ILCS 5/122-1. (Pet. at 3). Counsel filed supplemental petitions on June 16, 2008 and November 7, 2008. (Resp. Exh. G, Supplemental petition for postconviction relief in *People v. Owens*, No. 99 CR 25287; Resp. Exh. H, Amended supplemental petition for postconviction relief in *People v. Owens*, No. 99 CR 25287). On September 29, 2009, the trial court dismissed the petition as supplemented. (Resp. Exh. I, Docketing statement in *People v. Owens*, No. 1-09-2626). An appeal is currently pending.

On December 15, 2008, petitioner filed the instant habeas petition, arguing that:

(1) his due process rights were violated by delays in considering his state postconviction petition;

(2) there was no probable cause to arrest him;

(3) the trial court should have suppressed identification evidence because the photo array and lineup were improperly suggestive;

(4) the trial court made improper "extrajudicial" findings regarding petitioner's motive, and based its finding of guilt on evidence not produced at trial; and

(5) his trial and appellate counsel were ineffective "as alleged and or claimed on direct appeal." (Doc. 1 at 7).

2

**Rule 5 Exhibits**

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States

District Courts, respondent has filed the following exhibits to the instant Answer:

Exhibit A:     Brief of defendant-appellant in *People v. Owens*, No. 1-01-0341;

Exhibit B:     Brief and argument for plaintiff-appellee in *People v. Owens*, No. 1-01-0341;

Exhibit C:     Reply brief for defendant-appellant in *People v. Owens*, No. 1-01-0341;

Exhibit D:     Order in *People v. Owens*, No. 1-01-0341 (Ill.App. Dec. 4, 2002);

Exhibit E:     PLA in *People v. Owens*, No. 95534;

Exhibit F:     Order denying PLA in *People v. Owens*, No. 95534, 788 N.E.2d 733 (Table) (Ill. 2003);

Exhibit G:     Supplemental petition for postconviction relief in *People v. Owens*, No. 99 CR 25287;

Exhibit H:     Amended supplemental petition for postconviction relief in *People v. Owens*, No. 99 CR 25287; and

Exhibit I:     Docketing statement in *People v. Owens*, No. 1-09-2626.

**Statement of Facts**

**Trial**

All determinations of fact made by a State court are presumed to be correct unless the

petitioner rebuts that presumption by clear and convincing evidence.  28 U.S.C. §2254(e)(1).

Petitioner has not attempted to rebut the state court's findings of fact, and they are presumed

correct.  The following is based on facts either found or described by the state appellate court.

In a pre-trial hearing, petitioner unsuccessfully moved to quash his warrantless arrest

based on a lack of probable cause.  The following facts were presented at the hearing:

[Petitioner] testified that on October 26, 1999, he was driving down a street in Markham, Illinois, when he was arrested on a traffic violation. [Petitioner] testified that the arresting police officer never indicated that he had a warrant for [petitioner's] arrest. [Petitioner] testified that after he was arrested, he was placed in a lineup; however, he was not fingerprinted, photographed or processed. [Petitioner] testified that he has been held in custody ever since his arrest on the traffic stop. He testified that the police officers who arrested him on the traffic stop never questioned him about Nelson's murder.

* * *

On cross-examination, [petitioner] conceded that when he was arrested, he was driving in a blue Topaz automobile, but he denied that he drove 50 miles an hour in a 20 mile an hour zone, and he denied that he sped through a stop sign without stopping. [Petitioner] testified that as he was driving down the street, he did not see a squad car with its emergency lights activated until about 30 seconds before he stopped his car. [Petitioner] then knew the police were trying to pull him over. [Petitioner] testified that after he pulled his car over and exited the car, he walked away, but did not run. [Petitioner] testified that he walked from Sussex through a passageway and over to the next block on Nottingham. [Petitioner] was arrested after he informed police that he did not have a driver's license. On redirect-examination, [petitioner] testified that police officers never informed him that he was under arrest for murder.

* * *

Detective Terry White testified that he was assigned to the Nelson assault investigation on September 22, 1999. The detective testified that on September 28, 1999, six days after Nelson's assault and murder, he spoke with Maurice Johnnie and William Evans who both stated that they witnessed Nelson's beating. Johnnie described Nelson's attacker as a large black male, approximately 6'2" to 6'4", weighing about 220 to 240 pounds, dressed in brown. Evans described Nelson's attacker as a large black male, dressed in brown or tan. Detective White testified that Johnnie and Evans subsequently identified [petitioner] in a photo-array as the individual who attacked Nelson on the evening of September 22, 1999. The detective testified that based upon Johnnie and Evans' photo-array identifications, he informed his fellow officers to be on the look-out for [petitioner] because [petitioner] was wanted in connection with a murder investigation. On cross-examination, detective White acknowledged that no warrant was ever issued for [petitioner's] arrest.

* * *

4

Arresting Officer Mike Alexander testified that on September 29, 1999, at roll call, detective White informed him that [petitioner], also known as "Big O," was wanted in connection with a murder investigation. Officer Alexander testified that on the evening of October 26, 1999, at approximately 9:00 p.m., he arrested [petitioner] for a traffic violation; specifically speeding and driving without a driver's license. The officer testified that he was in an unmarked squad car, when he saw a blue Mercury Topaz speed by, traveling 50 miles an hour in a 20 mile an hour zone. Officer Alexander testified that he activated his emergency lights and sirens, but the Topaz did not stop. Instead, the Topaz sped up and accelerated through a stop sign. The Topaz proceeded northbound on Kedzie and then eastbound on Sussex, where it eventually pulled over and stopped. Officer Alexander testified that [petitioner] then exited the Topaz and ran northbound through a crosswalk. The officer testified that he exited his vehicle and gave chase on foot and eventually caught [petitioner] when they both ran out of wind. The foot chase covered approximately a block and a half. Officer Alexander testified that he arrested [petitioner] and transported him to the Markham police station when [petitioner] could not produce a driver's license. Officer Alexander testified that when he and [petitioner] reached the police station, he notified detective White that [petitioner] was in custody.

(Resp. Exh. D at 2-5). In support of his suppression motion, petitioner argued that if two credible witnesses had identified him from a photo-array, then the People should have sought an arrest warrant so that a judge could determine whether there was probable cause. (*Id.* at 5). He argued that no exigent circumstance existed to excuse the People's failure to obtain a warrant. (*Id.*). The People responded that the police had probable cause to arrest petitioner based on his speeding, running of a stop sign, and driving without a driver's license. (*Id.*). Furthermore, the People argued that the police had probable cause to arrest petitioner for Nelson's murder based on the photo-array identifications. (*Id.*). The trial court denied petitioner's motion to quash arrest.

The evidence at the subsequent trial showed as follows:

Johnnie testified that on the evening of September 22, 1999, sometime after 8:00 p.m., he was seated in the front passenger seat of his own car, which was parked near the entrance doors to Mackie's lounge and liquor store located on 159th and

5

Dixie Highway, in Markham, Illinois. Johnnie testified that his friend, Johnny Morgan was seated in the driver's seat and that a third individual was seated in the back seat. Johnnie testified that the third individual was Johnny Morgan's friend. Johnnie testified that his car was parked facing the lounge's front doors, approximately 10 feet away from the doors. The sun had gone down, but it was not dark yet, and the area in front of the lounge was illuminated by street lights and lights near the lounge's front doors.

\*      \*      \*

The third individual exited the car and went into the liquor store. Johnnie testified that he and Johnny Morgan remained in his parked vehicle and waited for the third individual to return. Johnnie testified that as he and Johnny Morgan were sitting in his car talking, Nelson, who was on a bicycle, pulled up alongside the vehicle's driver side door and began speaking with Johnny Morgan. Johnnie testified that he did not know Nelson. Nelson spoke to Johnny Morgan for about three to five minutes and then rode his bike past the front of the car, onto the sidewalk and proceeded down the sidewalk to the right of Johnnie.

\*      \*      \*

Johnnie testified that Nelson proceeded down the sidewalk on his bicycle and was about eight feet from the entrance of the lounge, when he attempted to turn around. Johnnie testified that he saw a man walking down the sidewalk approaching from his far right and toward Nelson as Nelson was attempting to turn his bicycle around. As Nelson was attempting to turn around, the man caught up with Nelson and started striking him on the head with a wooden stick or baseball bat type object. Johnnie testified that he saw Nelson get hit twice. After the first blow, Nelson, who was still on his bike, fell backwards into the doorway of the liquor store. And as Nelson lay on the ground, the man forcefully hit him a second time around the head area, with both hands on the bat. After the man hit Nelson a second time, he turned around and went back in the direction he came from.

\*      \*      \*

Johnnie testified that he and Johnny Morgan then exited his vehicle and went over to look at Nelson. Nelson's head was swollen and he was unconscious and groaning. Johnnie testified that people began to gather around and suggested that he and Johnny Morgan take Nelson to the hospital. Johnnie agreed to take Nelson to the hospital after Johnny Morgan insisted that they do so.

\*      \*      \*

6

Johnnie testified that about a week later, on September 28, 1999, at the police department's request, he went to the Markham police station where detective White showed him a photo-array. Johnnie testified that he identified [petitioner] as the man who attacked Nelson on September 22, 1999. He also testified that about a month later, on October 27, 1999, he went to the Markham police station where he picked [petitioner] out of a lineup, as the man who attacked Nelson on September 22, 1999.

*   *   *

On cross-examination, Johnnie acknowledged that on the night of the incident he did not speak to the police even though there was an officer present in the lounge when he and Johnny Morgan returned to the lounge from the hospital. Johnnie conceded that he did not talk to the police about the incident until September 28, 1999, when the police department requested that he come to the Markham police station. Johnnie testified that at the police station, he described Nelson's attacker as a male black [sic], approximately 240 pounds and about 6'2." [sic] When asked if that description could be characterized as "big and bulky," Johnnie replied that he would characterize it as "medium." When asked to look at the photograph of the lineup, Johnnie agreed with defense counsel that of the five individuals in the lineup, [petitioner] was the "biggest and the bulkiest." In addition, Johnnie agreed that he did not pick [petitioner] out of the lineup based upon height, because everyone in the lineup was seated.

*   *   *

On further cross-examination, Johnnie testified that just before Nelson came over to his car to speak with Johnny Morgan, Nelson had been standing with a crowd of about four or five individuals near the lounge. Nelson and Johnny Morgan spoke to each other for about three to five minutes. Johnnie testified that Nelson seemed to admire Johnny Morgan and complimented Morgan on driving the car.

*   *   *

Johnnie testified that on the evening of the incident, the lighting was good because the street lights were on and the area in front of the lounge was illuminated by lights coming from the lounge itself. Johnnie testified that the man who attacked Nelson, approached from the right and that the assailant's face was facing toward him during this approach. On redirect-examination, Johnnie testified that he got his best look at [petitioner] after [petitioner] had just finished striking Nelson and had turned to walk away.

7

(*Id.* at 5-9). The parties stipulated that officer Alexander would testify consistent with his testimony at the pre-trial hearing on petitioner's motion to quash his arrest. (*Id.* at 9). Detective White then testified that he assembled a photo-array of six men based on Johnnie's description of Nelson's attacker, and that Johnnie picked petitioner's photo out of the array, and identified him as Nelson's attacker. (*Id.*). Following petitioner's arrest, Detective White arranged a lineup, from which Johnnie and Evans independently selected petitioner. (*Id.* at 10). On cross-examination, Detective White acknowledged that petitioner was the only person who was in both the photo-array and the physical lineup. (*Id.*).

The next State's witness was Evans:

> He testified that he was currently incarcerated in the Cook County Department of Corrections on a charge of possession of a controlled substance with intent to deliver. In addition, he testified that he was currently on probation regarding a charge of delivery of a controlled substance. Evans conceded that in exchange for his truthful testimony, the State agreed to recommend a sentence of probation on the charge of possession of a controlled substance with the intent to deliver and to recommend a recommitment of probation on the charge of delivery of a controlled substance.

> \*     \*     \*

> Evans testified that on the evening of September 22, 1999, at approximately 8:00 p.m., he was on the northeast corner of the block on which Mackie's lounge is located, when he first saw Nelson, also known as Kermit. Evans knew Nelson from the neighborhood. Evans testified that it was just a little after dark, but it was not totally dark yet. In addition, the street lights were on and there were lights coming from the liquor store. Evans testified that he was able to see people's faces. Nelson was riding around the area on a small twenty-inch bicycle. Evans testified that he spoke with Nelson for about half an hour and then Nelson rode off toward the lounge's front entrance, where he stopped and sat on his bike near the lounge's front doors.

> \*     \*     \*

> Evans testified that he saw two guys walk up to Nelson and engage him in a
> conversation. One of the guys was [petitioner] and he was carrying a baseball bat
> in his hand. Evans testified that he did not know [petitioner], but he recognized
> [petitioner's] face since [petitioner] had previously been in the liquor store. Evans
> testified that at this time, he was near a garbage can on the northeast corner of the
> block near Mackie's lounge and liquor store, getting ready to retrieve his bucket to
> wash a car, when he heard something that sounded like wood splitting. Evans
> testified that when he looked back, he saw [petitioner] hitting Nelson with a
> baseball bat. [Petitioner] hit Nelson twice on the head. Evans testified that he
> could not see how many hands [petitioner] had on the bat when he struck Nelson,
> because [petitioner's] back was turned toward him. Nelson was laying near the
> entrance to the liquor store and he was still on his bike. Evans testified that he
> hollered, "hey, what is going on," whereupon [petitioner] and the second
> individual both ran north past him.

(*Id.* at 10-12). The prosecutor then showed Evans a photo-array, which Evans identified as the

one he viewed at the police station. (*Id.* at 12). However, Evans twice identified the wrong

photo when asked to point to the photo of petitioner he selected at the station. (*Id.*). Evans then

successfully identified petitioner from a photo of the lineup he had viewed at the police station

after petitioner's arrest. (*Id.*). Evans then continued his account of the night Nelson was

attacked:

> Evans testified that right after Nelson was beaten, he went over to see him.
> Nelson was laying in the middle of the door shaking and he could not talk. Evans
> help[ed] put Nelson into a car. Evans testified that the men in the car told him not
> to go anywhere and that they would be right back. When Evans was shown a
> photograph of the lounge and liquor store and asked if the photograph fairly
> depicted the way the lounge and liquor store looked on the night of the incident,
> Evans replied that it "was not that bright."

> *           *           *

> On cross-examination, Evans denied that he was involved with a gang. He also
> denied that Nelson was one of his associates, testifying that he knew Nelson only
> from around the neighborhood. Evans testified that he never saw a car parked in
> front of Mackie's lounge and liquor store and claimed that he did not see a car
> until he and other individuals were putting Nelson into the car. Evans testified
> that he first saw Nelson at the northern end of Mackie's, not the southern end.

9

Evans also testified that the two individuals that confronted Nelson, approached from the north walking southbound. Evans testified that immediately after the incident, he briefly spoke with the police and told them what he had seen. He gave police the approximate heights of the two individuals that confronted Nelson and he informed the officers that he recognized one of the individuals from around the neighborhood. Evans testified that he did not give police a full physical description of the two individuals, because the police did not ask him for one.

\*      \*      \*

On redirect-examination, Evans acknowledged that before he was arrested for his second drug case for which he was presently incarcerated, he had already given grand jury testimony regarding Nelson's murder. Evans acknowledged that when he testified before the grand jury, he testified that on the evening of the incident, Nelson left him at the north corner and went to talk to some guys in a car. Evans testified that he told the grand jurors that he barely saw Nelson because he was going to get his bucket to go wash a car. He also testified that he told grand jurors that after he heard the sound of wood cracking and saw [petitioner] hit Nelson with a bat, [petitioner] and a second individual ran past him, running north down Dixie highway.

(*Id.* at 12-14). The parties also stipulated that forty bags of crack cocaine were recovered from the victim's coat. (*Id.* at 14-15). The defense rested without presenting evidence. (*Id.* at 15).

After hearing closing arguments, the trial court stated:

I think all of the witnesses skirted the real issue. The issue to me was you have a seventeen year old youth on a bike who is a drug dealer, who [petitioner] knew he was a drug dealer. [Petitioner] wanted to knock him off. I think the State's evidence has proved that fact. Finding of guilty of murder.

(*Id.*). Petitioner was sentenced to twenty-five years' imprisonment. (*Id.*).

**<u>Direct Appeal</u>**

On direct appeal, petitioner argued, in relevant part:

(1)      there was no probable cause to arrest him;

(2)      the trial court should have suppressed identification evidence because the photo array and lineup were improperly suggestive;

10

(3)    the trial court made improper "extrajudicial" findings regarding petitioner's motive, and based its finding of guilt on evidence not produced at trial; and

(4)    his trial counsel was ineffective for failing to:

    (A)    test the State's evidence,

    (B)    properly investigate and call witnesses favorable to the defense, and

    (C)    allow petitioner to testify.

(Resp. Exh. A).  The Illinois Appellate Court affirmed petitioner's convictions.  (Resp. Exh. D at 34).  First, the court held that "under the totality of the circumstances, the police had probable cause to arrest [petitioner] for Nelson's homicide."  (*Id.* at 17).  The court also held that petitioner had "waived his right to argue that the photo-array and lineup procedures were suggestive."  (*Id.* at 19).  Third, the court held that the trial court's speculation regarding petitioner's motive was harmless.  (*Id.* at 27).  Finally, the court rejected all of the bases for petitioner's ineffective assistance of counsel claim.  (*Id.* at 30-32).

Petitioner's PLA claimed that the trial court made improper "extrajudicial" findings regarding petitioner's motive, but abandoned the other claims presented to the appellate court and reiterated in the instant petition.  (Resp. Exh. E).  On April 2, 2003, the Illinois Supreme Court denied petitioner's PLA.  (Resp. Exh. F).

**Postconviction Petition**

Petitioner filed a postconviction petition pursuant to 725 ILCS 5/122-1, *et seq.*, which was subsequently supplemented by counsel, raising claims of ineffective assistance of trial counsel.  (Resp. Exhs. G, H).  Petitioner contends that trial counsel was ineffective for failing to interview and call alibi witnesses and for failing to allow petitioner to testify.  (Resp. Exh. G).

11

He also argued that he was actually innocent. (Resp. Exh. H). On September 29, 2009, the trial court dismissed the petition as supplemented, and petitioner appealed. (Resp. Exh. I). That appeal is currently pending.

## ARGUMENT IN OPPOSITION TO HABEAS RELIEF

**I.      The Section 2254(d) Standard And The Standard of Review**

Petitioner's habeas corpus petition was timely filed on April 22, 2009, and AEDPA applies to it.

### A.      Procedural Default

Before a federal court may consider a habeas claim of a state inmate, the petitioner must afford the state courts a full and fair opportunity to consider constitutional objections to the inmate's imprisonment. *Johnson v. Pollard*, 559 F.3d 746, 751 (7th Cir. 2009); *Farrell v. Lane*, 939 F.3d 409, 410 (7th Cir. 1991). Thus, before considering the merits of a habeas petition, a district court must determine whether the petitioner fairly presented all his claims during the course of the state court proceedings. *Johnson v. Loftus*, 518 F.3d 453, 455 (7th Cir. 2008); *Farrell*, 939 F.2d at 410 (citing *Henderson v. Thieret*, 859 F.2d 492, 496 (7th Cir. 1988)). This means that a habeas petitioner forfeits the right to raise an issue in his federal habeas petition if he failed to raise it, inter alia, on appeal to the state's highest court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007) (failure to take claim through complete round of appellate process results in procedural default). Claims never raised in state court cannot be raised for the first time in a federal habeas petition. *Conner v. McBride*, 375 F.3d 643, 648 (7th Cir. 2004); *Kurzawa v. Jordan*, 146 F.3d 435, 441 (7th Cir. 1998). A procedural default also occurs when a state court disposes of a claim on an independent

and adequate state law ground. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Johnson*, 518 F.3d at 455.

To excuse a procedural default, petitioner must show "cause for the default and actual prejudice as a result of the alleged violation of federal law," or that the failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. "Cause" is defined as some external objective factor that impeded compliance. *Gonzalez v. Mize*, 565 F.3d 373, 381 (7th Cir. 2009); *Barksdale v. Lane*, 957 F.2d 379, 382 (7th Cir. 1992) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). The "fundamental miscarriage of justice" pathway is limited to the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 321 (1995); *see House v. Bell*, 547 U.S. 518, 537-38 (2006). A petitioner who asserts actual innocence to excuse a default "must *demonstrate* innocence; the burden is his, not the state's, for the state has the benefit of the jury's verdict." *Buie v. McAdory*, 341 F.3d 623, 627 (7th Cir. 2003) (emphasis in original).

## B.     Adjudication of the Merits Under AEDPA

If a petitioner's claim was both fairly presented in his state court pleadings before the state appellate and supreme courts, and adjudicated on the merits in state court, it must be examined through the lens of AEDPA. AEDPA requires that this Court deny habeas relief unless the decision on the merits by a state reviewing court is either "contrary to" or an "unreasonable application of" United States Supreme Court precedent, or was premised on an unreasonable determination of facts. 28 U.S.C. §2254(d)(1)-(2). The burden of proof falls squarely on petitioner to show that he is entitled to relief under any of these theories. *Woodford v. Visciotti*,

537 U.S. 19, 25 (2002). Furthermore, this Court is obligated to presume that the state courts

know and follow the rules of federal constitutional law. *Id.* at 24.

A state court's decision is "contrary to" clearly established federal law only "if the state

court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a

question of law; [or] if the state court confronts facts that are materially indistinguishable from a

relevant Supreme Court precedent and arrives at a result opposite to [the United States Supreme

Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). This Court is obligated to deny habeas

relief under the "contrary to" clause even if the state reviewing court's decision is not an

exemplar of good legal drafting: "[a]voiding these pitfalls does not require citation of [Supreme

Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as

neither the reasoning nor the result of the state-court decision contradicts them." *Early v.

Packer*, 537 U.S. 3, 8 (2002) (emphasis in original); *see also*, *e.g.*, *Gonzalez*, 565 F.3d at 384 n.8

(holding that state court decision was not contrary to Supreme Court precedent where state court

failed to identify relevant Supreme Court test, but state court's *conclusion* was consistent with

Supreme Court precedent).

With respect to the "unreasonable application" prong, "a federal habeas court . . . should

ask whether the state court's application of clearly established federal law was objectively

unreasonable." *Williams*, 529 U.S. at 409. The Court has cautioned that "an unreasonable

application of federal law is different from an *incorrect* application of federal law." *Id.* at 410

(emphasis in original). Thus, "a federal habeas court may not issue the writ simply because that

court concludes in its independent judgment that the relevant state-court decision applied clearly

established federal law erroneously or incorrectly. Rather, that application must also be

14

unreasonable." *Id.* Furthermore, all determinations of fact made by a State court are presumed to be correct unless the petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## II. Petitioner's Inordinate Delay Claim Is Non-Cognizable On Habeas Review.

Petitioner contends that he is entitled to a writ of habeas corpus because the Illinois trial court inordinately delayed adjudicating his PC petition. A delay in state postconviction proceedings — even if inordinate and unjustified — is not a proper basis for habeas relief. *Jackson v. Duckworth*, 112 F.3d 878, 880 (7th Cir. 1997) (habeas does not compensate for defects in collateral review process); *Montgomery v. Meloy*, 90 F.3d 1200, 1206 (7th Cir. 1996) ("[d]ue process does not include prompt resolution of collateral appeals"); *see also Mason v. Meyers*, 208 F.3d 414, 417 (3d Cir. 2000) (delay in postconviction proceedings not valid basis for habeas "[e]ven if such a delay constitutes a due process violation"). Therefore, petitioner is not entitled to relief on this claim.

## III. The Illinois Appellate Court's Rejection Of Petitioner's Extrajudicial Findings Claim Was Neither Contrary To, Nor An Unreasonable Application Of, United States Supreme Court Precedent.

Petitioner claims that he was denied the right to a fair trial by the trial court's "extrajudicial findings regarding alleged motive to commit the crime." (Doc. 1 at 7). The Illinois Appellate Court rejected that claim, (Resp. Exh. D at 24-27), and petitioner is entitled to habeas relief only if the state court's holding was either contrary to, or an unreasonable application of, United States Supreme Court precedent. 28 U.S.C. §2254(d)(1). The state court holding falls into neither of those categories. First, the state court's holding that any error was harmless was neither contrary to, nor an unreasonable application of *Chapman v. California*, 386

15

U.S. 18 (1967). Second, any error is harmless under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which applies on federal habeas review. *Fry v. Pliler*, 551 U.S. 112, 120 (2007). In any event, the trial court's conduct in this case did not violate petitioner's Constitutional rights. And because the Supreme Court has never held that inferring a motive, a non-element, even if that inference is not fully supported by the evidence at trial, entitles a defendant to a new trial, the state appellate court's holding that petitioner was not entitled to a new trial in this case cannot be contrary to, or an unreasonable application of, Supreme Court precedent. *See Wright v. Van Patten*, 552 U.S. 120, 128 S.Ct. 743, 746-47 (2008); *Carey v. Musladin*, 549 U.S. 70, 77 (2006). Even if the state court's holding that the error was harmless does not constitute a rejection of petitioner's claim entitled to deference under § 2254(d), habeas relief nevertheless would be barred by the retroactivity principle announced in *Teague v. Lane*, 489 U.S. 288 (1989).

Any constitutional error – and there was none – was harmless. The state court's conclusion that any error was harmless was neither contrary to, nor an unreasonable application of *Chapman*. The state appellate court held, "[T]he trial court's speculation as to [petitioner's] motive for assaulting Nelson, will be construed as harmless error." (Resp. Exh. D at 27). Although the Illinois Appellate Court did not specifically discuss *Chapman*, or any other federal cases or constitutional provisions in conjunction with petitioner's claim, it rejected his arguments on that issue, holding that it was error, but was harmless. (*Id.* at 24-27). This holding is entitled to deference under § 2254(d)(1). *See Johnson v. Acevedo*, 572 F.3d 398, 404 (7th Cir. 2009) (if state court conducted harmless error inquiry, question confronting federal courts is whether that analysis was a reasonable application of *Chapman*); *see also Muth v. Frank*, 412 F.3d 808, 815

16

(7th Cir. 2005) ("[S]everal circuits have held that a state court need not offer *any* reasons and summarily dispose of a petitioner's claim and that summary disposition would be an adjudication on the merits."); *see also Malinowski v. Smith*, 509 F.3d 328, 334 (7th Cir. 2007) (holding that when state court rejects stated arguments it resolves claims on the merits). Thus, the bottom-line result reached by the state court, not its reasoning, is reviewed under § 2254(d)(1). *See Hough v. Anderson*, 272 F.3d 878, 897-98 n.7 (7th Cir. 2001) ("Under AEDPA, it is a state court's resolution of an issue, as opposed to its reasoning process, that must be treated with deference."); *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997) (rejecting proposition that federal habeas courts may "insist not only that the [state court's] outcome be reasonable in relation to the evidence but that the [state court] articulate a rational path connecting the law and the evidence to the outcome"). Avoiding relief under § 2254(d)(1) "does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8.

Given the compelling evidence against petitioner, including two eyewitnesses, (Resp. Exh. D at 5-14), the state court reasonably concluded that the error was harmless. *See Chapman*, 386 U.S. at 24. Johnnie testified that the incident occurred just a few feet away from where he sat, that the area was well lit, and that he saw petitioner's face immediately prior to and after the attack. (Resp. Exh. D at 27). Johnnie's description of the attacker and his clothing on the night of the attack were consistent with petitioner's actual physical appearance and Evans's testimony regarding petitioner's appearance on the night of the murder. (*Id.* at 28). Less than a week after the attack, Johnnie identified petitioner in a photo-array, and he subsequently identified petitioner

in a lineup and in court, expressing a high level of certainty in his identification each time. (*Id.*).

Johnnie's testimony was largely corroborated by Evans. He testified that there was enough light

to see people's faces, and that he saw two guys walk up to Nelson and engage him in a

conversation before one of them, whom Evans identified as the petitioner, began hitting Nelson

with a baseball bat. (*Id.* at 10-12). The prosecutor showed Evans a photo-array, which Evans

identified as the one he viewed at the police station when he identified petitioner as the attacker.

(*Id.* at 12). While Evans twice identified the wrong photo when asked to point to the photo of

petitioner he selected at the station, he successfully identified petitioner from a photo of the

lineup he had viewed at the police station after petitioner's arrest, when he also identified

petitioner as the attacker. (*Id*). Additionally, the trial court's inference dealt solely with

petitioner's motive, not an element of the crime of murder, and was arguably a reasonable

inference from the evidence produced at trial: Nelson had forty bags of crack cocaine on him at

the time of the attack. (*Id.* at 14-15). Therefore the state appellate court's holding that any error

was harmless was neither contrary to, nor an unreasonable application of, *Chapman*.

And the same conclusion can also be reached by this Court under *Brecht*, which applies

on federal habeas review. *Fry*, 551 U.S. at 120. For the same reasons the state court's

harmlessness finding was reasonable, any error cannot be said to have had a substantial and

injurious effect or influence on the verdict resulting in actual prejudice to petitioner. *See Brecht*,

507 U.S. at 637. Therefore, any error was harmless, and petitioner is not entitled to habeas relief.

In any event, the trial court's inference regarding motive did not violate petitioner's

Constitutional rights, even if that inference was not conclusively supported by the evidence

introduced at trial. The Supreme Court has, of course, held that the finder of fact must find all

18

*elements* of a crime proven beyond a reasonable doubt based on the evidence introduced at trial. *See, e.g.*, *Apprendi v. New Jersey*, 530 U.S. 466, 499-500 (2000); *In re Winship*, 397 U.S. 358, 364 (1970). However, under Illinois law, motive is not an element of the crime of murder. *People v. Hobbs*, 220 N.E.2d 469, 472 (Ill. 1966). So, petitioner cannot rely on this line of Supreme Court precedent to receive habeas relief in the instant case.

It is also true that "[d]ue process requires that the accused receive a trial by an impartial [fact finder] free from outside influences" such as negative publicity. *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966). But petitioner does not suggest that the trial judge's inference results from such outside influences. Therefore, petitioner cannot rely on this, or similar, Supreme Court precedent to receive habeas relief.

Indeed, the trial court's inference was reasonably based on evidence that was introduced at trial. Evidence at trial demonstrated that two men, including petitioner, approached Nelson at night outside a liquor store and engaged him in a conversation, before petitioner hit Nelson with a bat. (Resp. Exh. D at 10-12). Police subsequently found forty bags of crack cocaine in Nelson's coat. (*Id.* at 14-15). The trial court's inference – that the attack involved a dispute over illegal drugs (*Id.* at 15) – is a reasonable inference. *See People v. Robinson*, 657 N.E.2d 1020, 1026-27 (Ill. 1995) (reasonable inference of intent to deliver narcotics based on (1) amount of narcotics that could not be viewed as designed for personal consumption, or (2) the manner in which the substance is packaged); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (it is finder of fact's responsibility to draw reasonable inferences from evidence).

There is another reason to deny relief: the appellate court's ultimate holding that petitioner was not entitled to a new trial is entitled to review under AEDPA. *See Hough*, 272

19

F.3d at 897-98 n.7 ("Under AEDPA, it is a state court's resolution of an issue, as opposed to its reasoning process, that must be treated with deference.").  Where, as here, the United States Supreme Court has never clearly held that petitioner's claim or one very close would result in a violation of his federal constitutional rights, it cannot be said that the state court unreasonably applied clearly established Supreme Court precedent in denying him relief.  *Wright*, 128 S.Ct. at 746-47; *Musladin*, 549 U.S. at 77.  Petitioner does not identify, nor can respondent find, a single Supreme Court case with which the state court decision conflicts or that it unreasonably applies. For petitioner to prevail on federal habeas, he would have to receive the benefit of a rule that the Supreme Court has never recognized: that inferring motive – a non-element of the crime – entitles petitioner to a new trial if that inference is not fully supported by the evidence at trial. Such a step is impermissible under § 2254.  *See Wright*, 128 S.Ct. at 746-47; *Musladin*, 549 U.S. at 77.  No Supreme Court decision addresses the question presented here, much less finds clearly in petitioner's favor. Therefore, the state court's holding rejecting petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established federal law, and this Court should deny petitioner relief on this claim.  28 U.S.C. § 2254(d)(1).

In the absence of AEDPA, the claim would be barred by *Teague.*  Under *Teague*, habeas relief is unavailable on this ground because, at the time petitioner's conviction became final, there was (and is now) no rule holding that the trial court's inference in this case violates the Constitution.  *Teague* holds that "new constitutional rules of criminal procedure will not be announced or applied on collateral review."  *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993); *see also Gacy v. Welborn*, 994 F.2d 305, 310-11 (7th Cir. 1993) ("[F]ederal courts may not apply

20

rules of constitutional law devised or altered after the conclusion of the prisoner's direct

appeals.").

## IV. Petitioner Has Procedurally Defaulted His Remaining Claims By Failing To Present Them In One Complete Round Of State Court Review, And He Can Demonstrate Neither Cause And Prejudice, Nor A Fundamental Miscarriage Of Justice, To Excuse His Defaults.

Petitioner procedurally defaulted his remaining habeas claims that:

(1)     there was no probable cause to arrest him;

(2)     the trial court should have suppressed identification evidence because the photo array and lineup were improperly suggestive; and

(3)     his trial and appellate counsel were ineffective "as alleged and or claimed on direct appeal." (Doc. 1 at 7).

Petitioner presented these claims to the state appellate court on direct appeal, but he did not

present them to the Illinois Supreme Court in his ensuing PLA. Therefore, these claims are

procedurally defaulted. *O'Sullivan*, 526 U.S. at 845 (petitioner must present claims in one

complete round of state court review); *Stevens*, 489 F.3d at 894 (failure to take claim through

complete round of appellate process results in procedural default). Petitioner's effort to re-raise

on postconviction review a factual basis for ineffective assistance of counsel – that counsel failed

to allow petitioner to testify – that was rejected on direct appeal (and abandoned in his PLA) is

futile. Under Illinois law, issues that were decided on direct appeal are barred by the doctrine of

res judicata, and issues that could have been raised on direct appeal, but were not, are forfeited;

therefore Illinois law prohibits re-review of petitioner's claim because it was decided on direct

appeal. *See People v. Cloutier*, 191 Ill.2d 392, 397 (2000). Filing a second postconviction

petition raising petitioner's remaining claims would likewise be futile. Illinois law prohibits

21

petitioner from bringing such a successive postconviction petition without leave of court and the demonstration of cause and prejudice. 725 ILCS 5/122-1(f). Those claims are now forfeited because of their omission from his original and amended state postconviction petitions. 725 ILCS 5/122-3. Accordingly, petitioner's claims that were not presented in the PLA – whether or not they were reasserted in his postconviction petition – are now barred by the procedural default doctrine that precludes a habeas court from reaching a habeas claim's merits "when . . . the claim was not presented to the state courts and it is clear that those courts would now hold the claim procedurally barred." *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004).

This Court's holding that petitioner need not fulfill the exhaustion requirement because of inordinate delays in his postconviction proceedings allows petitioner to bypass those proceedings and bring the federal claims alleged there directly to federal court. *See Jackson v. Duckworth*, 112 F.3d 878, 881 (7th Cir. 1997). But that holding does not excuse petitioner's default of those claims where he raised them on direct appeal and failed to pursue them through a complete round of review, and where he can not revive them in a state collateral attack under Illinois law. *See Perruquet*, 390 F.3d at 514.

Petitioner has demonstrated neither cause and prejudice to excuse these procedural defaults, nor a miscarriage of justice. No cause is suggested to excuse the failure to raise any of his claims except for the inordinate delay in resolving of his state collateral attack. That assertion is beside the point: petitioner raised all of these claims in his direct appeal, and offers no reason for abandoning them in his ensuing PLA other than his choice not to pursue the claims through a complete round of review when he had the opportunity. Thus, petitioner has failed to identify the

22

kind of external, objective factor that impeded compliance with the exhaustion doctrine as is necessary to excuse his default. *Gonzalez*, 565 F.3d at 381; *Barksdale*, 957 F.2d at 382.

Nor does petitioner offer any new evidence to prove his actual innocence. Furthermore, any claim of actual innocence cannot succeed in light of the overwhelming evidence, including multiple eyewitnesses to the crime, as detailed by the state appellate court. (Resp. Exh. D at 5-14). Because there are no grounds to excuse petitioner's defaults, this Court should deny habeas relief on his procedurally defaulted claims. *See Gonzalez*, 565 F.3d at 381.

Finally, petitioner's claim that his fourth amendment rights were violated is non-cognizable on federal habeas review under *Stone v. Powell*, 428 U.S. 465 (1976). *See Ben-Yisrayl v. Buss*, 540 F.3d 542, 552 (7th Cir. 2009) (federal review of fourth amendment claims barred where petitioner had opportunity for full and fair litigation in state court). Here, the state trial court conducted a full pre-trial evidentiary hearing on petitioner's claim that police lacked probable cause to arrest him for murder. (Resp. Exh. D at 2-5). Additionally, petitioner's claim was raised, and rejected, in the state appellate court. (Resp. Exh. A; Resp. Exh. D at 17). Petitioner filed a PLA, but elected not to include his fourth amendment claim, and no excuse has been suggested to excuse that omission. (Resp. Exh. E). Because petitioner had a full opportunity to litigate his claim at every stage of his proceeding in state court, review by this court is barred. *See Ben-Yisrayl*, 540 F.3d at 552.

## V.     This Court Should Not Grant A Certificate Of Appealability

To obtain a certificate of appealability (CA), petitioner must make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  If the district court "denies a habeas petition on procedural grounds without reaching the merits of the prisoner's underlying

23

constitutional claim, a CA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

This Court should decline to certify any issues for appeal because, as demonstrated by respondent, it is not debatable that petitioner should be denied relief. His inordinate delay claim is non-cognizable; the state court's rejection of his claim that the trial court drew an improper inference of motive was neither contrary to, nor an unreasonable application or, Supreme Court precedent; and petitioner defaulted his remaining claims (one of which – that police lacked probable cause to arrest him – is also non-cognizable) by abandoning them in his PLA.

**CONCLUSION**

This Court should deny the instant petition for a writ of habeas corpus without granting an evidentiary hearing and deny a certificate of appealability. If this Court holds that any of petitioner's habeas claims not addressed on the merits here are not procedurally defaulted, respondent requests thirty days from the date of this Court's order to that effect in which to file an answer on the merits of the claim(s).

May 4, 2010

Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois

By: s/ Garson Fischer
GARSON S. FISCHER, Bar # 6286165
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601-3218
PHONE: (312) 814-2566
FAX: (312) 814-2253
EMAIL: gfischer@atg.state.il.us

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 4, 2010, I electronically filed respondent's **Answer** with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system, which will send electronic notice to the following registered party, counsel for petitioner:

Damon M. Cheronis
Law Offices of Damon M. Cheronis
53 West Jackson Boulevard
Suite 1750
Chicago, Illinois 60604

LISA MADIGAN
Attorney General of Illinois

By:     s/ Garson Fischer
        GARSON FISCHER, Bar # 6286165
        Assistant Attorney General
        100 West Randolph Street, 12th Floor
        Chicago, Illinois 60601-3218
        TELEPHONE: (312) 814-2566
        FAX: (312) 814-2253
        E-MAIL: gfischer@atg.state.il.us