**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA, ex rel.** | ) | |
| **LARRY OWENS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **No. 08 C 7159** |
| **v.** | ) | |
| | ) | **Hon. Rebecca R. Pallmeyer** |
| **GERARDO ACEVEDO, Warden,** | ) | |
| **Hill Correctional Center** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

At a bench trial on November 8, 2000, Petitioner Lawrence Owens ("Owens" or "Petitioner") was convicted of first degree murder for beating Ramon Nelson to death with a baseball bat outside a liquor store. Owens was sentenced to 25 years in prison. He challenged his conviction in an unsuccessful direct appeal and by way of a petition for postconviction relief; his state remedies have been exhausted. In this action pursuant to 28 U.S.C. § 2254, Owens raises five grounds for relief: (1) due process violations for the delay in the state trial court's resolution of his postconviction relief petition; (2) lack of probable cause for his arrest; (3) admission of improperly suggestive photo array and line-up evidence at trial; (4) the trial court's reliance on improper "extrajudicial" findings regarding Owens's motive, based on evidence not produced at trial; and (5) ineffective assistance of counsel for his trial counsel's failure to investigate Petitioner's alibi or call alibi witnesses to testify, and for denying Owens his right to testify on his own behalf. For the reasons explained here, the court denies the petition with respect to Claims 1-4, but concludes that Petitioner is entitled to an evidentiary hearing of limited scope on his ineffective assistance on counsel claims (Claim 5).

## FACTUAL BACKGROUND

On habeas review, this court presumes the facts as found by the state court correct, absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). The following facts are derived from the Illinois appellate court's order affirming Petitioner's conviction on direct appeal. (Order, *People v. Owens*, No. 1-01-0341 (Ill. App. 1st Dist. Dec. 4, 2002) (hereinafter, "Direct Appeal Order"), Ex. D to Resp't's Answer.)

## I.    Evidence at Trial

On the evening of September 22, 1999, sometime after 8:00 p.m., an assailant, later identified by eyewitnesses as Owens, attacked seventeen-year-old Ramon Nelson with a baseball bat outside a liquor store and lounge in Markham, Illinois, resulting in Nelson's death. (*Id.* at 5-7, 11-12, 14.) Maurice Johnnie, one of the two eyewitnesses who appeared at trial, testified that he was in the passenger's seat of his own car with two friends, parked about ten feet from the entrance to the liquor store and facing that direction. (*Id.* at 6.) It was not quite dark yet, and the front of the store was illuminated by streetlights and lights from the liquor store's front door. (*Id.*) Eventually, one friend entered the liquor store, leaving Johnnie and the other friend, Johnny Morgan, in the car. (*Id.*)

While Johnnie and Morgan waited in Johnnie's car outside the liquor store, Nelson approached the car on a bicycle and spoke to Morgan, who was seated on the driver's side. (*Id.*) Johnnie did not know Nelson. (*Id.*) After speaking to Morgan for three or five minutes, Nelson proceeded down the sidewalk, away from the passenger's side of the car, towards the entrance of the liquor store. (*Id.* at 6-7.) Johnnie then observed a man walking down the sidewalk in the opposite direction and toward Nelson. (*Id.* at 7.) Nelson attempted to turn his bicycle around, but the man caught up with him and hit Nelson on the head with a baseball bat. (*Id.*) Nelson fell from his bicycle into the doorway of the store, where the assailant hit him in the head a second time, forcefully and with both hands on the bat. (*Id.*) After the second hit, the attacker turned and walked back in the direction from which he had come. (*Id.*) Johnnie testified that he saw the attacker's

face on his approach, but got his best look after the attacker had finished his assault.  (*Id.* at 9.)
Johnnie and Morgan then went to check on Nelson, found him unconscious and groaning, and, at
Morgan's insistence, took him to the hospital in Johnnie's car. (*Id.* at 7.)  Nelson died in the hospital
the next day as a result of multiple skull fractures.  (*Id.* at 14; Markham Police Department Case
Report, Brief of Defendant-Appellant Lawrence Owens in *People v. Owens*, No. 1-01-0341
(hereinafter "Pet'r's Direct Appeal Brief"), Ex. A to Resp't's Answer, at A-7 to -8.)

The second eyewitness to testify at trial was William Evans.  (Direct Appeal Order at 10.)
Evans, who had a previous drug conviction and was in custody on another drug charge at the time
of trial, acknowledged that he was testifying in return for a recommendation of probation.  (*Id.* at 10-
11.)  Evans testified that he was on the same block as the liquor store, and that he spoke to Nelson,
whom he knew from the neighborhood, for about a half hour before the attack.  (*Id.* at 11.)  After
their conversation, Evans saw Nelson proceed toward the entrance of the liquor store on his
bicycle.  (*Id.*)  At the time the attack began, Evans was retrieving a bucket at the northeast corner
of the block in order to wash a car.  (*Id.*)  Evans was first made aware of the attack when he heard
a sound like wood splitting.  (*Id.* at 12.)  Evans looked around the corner of the building and saw
the assailant hitting Nelson with the bat.  (*Id.*)  While Evans did not know the assailant, he
recognized the assailant as someone who had visited the liquor store and lounge in the past.  (*Id.*)
Evans hollered, "hey, what is going on," whereupon the assailant and another man ran off past him.
(*Id.*)  Following the attack, Evans went to see Nelson, and helped put Nelson into Johnnie's car.
(*Id.* at 13.)  Immediately after the incident, Evans briefly spoke with police officers, described the
approximate height and weight of the two individuals, and informed them that he had recognized
the assailant from the neighborhood.  (*Id.*)

Johnnie did not speak with police officers on the night of the incident (*id.* at 8), and he gave
a false name and address when he dropped Nelson off at the hospital.  (Markham Police
Department Case Report.)  Responding officers at the scene of the crime learned the license plate

number of the car that transported Nelson to the hospital, however, and Detective White was able to identify Johnnie from the vehicle's registration. (*Id.*) Detective White contacted Johnnie, who agreed to an interview at the Markham police station on September 28, 1999, a week after the incident. (*Id.*) Johnnie described the attacker as a large black male, approximately 6'2" to 6'4", weighing 220 to 240 pounds, and dressed in brown. (Direct Appeal Order at 8.) Detective White compiled a photo array based on Johnnie's description. (*Id.* at 9.) Johnnie selected Owens's photo from the array as the photo of the individual who attacked Nelson. Detective White testified at trial that he never said the assailant was in the array and never made any suggestive remarks regarding the array. (*Id.*)

Evans also viewed the photo array at the station on September 28, 1999, and also described the assailant as a large black male, dressed in brown or tan. (*Id.* at 3.) Detective White testified that Evans identified Owens as the person who attacked Nelson. (*Id.*) At trial, however, when asked by the prosecutor which photo in the array he had identified as the assailant's, Evans pointed to a photograph of a person other than Owens. (*Id.* at 12.) When given another opportunity by the prosecutor, Evans again failed to select Owens's photograph. (*Id.*)

Following the photo identifications, Detective White directed his fellow officers to be on the lookout for Owens. (*Id.* at 4.) No arrest warrant was issued, but Detective White informed Officer Mike Alexander on September 29, 1999, that Owens, also known as "Big O," was wanted in connection with a murder investigation. (*Id.*)

On October 26, 1999, Officer Alexander observed a blue Mercury Topaz speed by his unmarked squad car, traveling fifty miles per hour in a twenty-mile-per-hour zone. (*Id.* at 4.) According to Officer Alexander, the car did not stop when he activated his emergency lights and siren. (*Id.*) Instead, the Topaz accelerated through a stop sign and proceeded northbound, with Alexander in pursuit. (*Id.*) When the Topaz eventually pulled over, Owens exited the vehicle and ran northbound through a crosswalk. (*Id.*) Alexander gave chase and caught Owens a block and

a half away. (*Id.*)  At a hearing on Owens's unsuccessful motion to quash his arrest, Owens denied that he was speeding or that he ran a stop sign.  (*Id.* at 2-3.)  He claimed that he did not see the squad car until thirty seconds before he pulled over, and that he walked, not ran, from the car.  (*Id.* at 3.)  Owens did not deny, however, that he was driving the car.  (*Id.*)  Alexander placed Owens under arrest and transported him to the Markham police station when Owens could not produce a driver's license.  (*Id.* at 4-5.)

On reaching the station, Alexander informed Detective White that Owens was in custody. (*Id.* at 5.)  On October 27, 1999, witnesses Johnnie and Evans independently selected Owens out of a five-man lineup organized by Detective White.  (*Id.*)  Detective White acknowledged that Owens was the only man who appeared in both the lineup and the photo array, and Johnnie acknowledged at trial that Owens was the "biggest and bulkiest" of the people in the lineup.  Johnnie asserted, however, that the identification was not based on height because everyone in the lineup was seated.  (*Id.* at 8.)  Prosecutors also showed Evans a photograph of the lineup at trial and asked Evans to pick out the individual he selected at the station.  (*Id.* at 12.)  Evans pointed out Owens in the lineup photograph after having failed to identify Owens as the person whom he had selected from the photo array.  (*Id.*)

Following the witness testimony, the parties presented a series of stipulations regarding Nelson's cause of death, the fact that Nelson had forty bags of cocaine on him when attacked, and that a transcript of Evans's grand jury testimony was accurate.  (*Id.* at 15.)  After these stipulations, the state rested.  (*Id.*)  The court denied Owens's motion for a directed finding, and the defense rested without presenting any evidence.  (*Id.*)

After closing arguments in Owens's bench trial, Judge Joseph Macellaio of the Circuit Court of Cook County stated:

> After hearing this case, I think all of the witnesses skirted the real issue.  The issue
> to me was you have a seventeen year old youth on a bike who is a drug dealer, who

> [Owens] knew he was a drug dealer. [Owens] wanted to knock him off. I think the State's evidence has proved that fact. Finding of guilty of murder.

(Excerpt of Trial Tr., App. to Pet'r's Direct Appeal Brief, at A-4 to -5.) It is unclear from the record what evidence the judge considered in support of this finding. Certainly, there was evidence that Nelson dealt drugs—he had a significant quantity of cocaine in small bags on his person. There is also evidence that at least one of the prosecution's two witnesses was involved in the illegal drug trade. No other record evidence suggests that Owens knew Nelson was a drug dealer, however, or that Owens himself was involved in drug trade. The judge sentenced Petitioner to twenty-five years' imprisonment. (*Id.* at A-6.)

### III. Postconviction Affiant Testimony

In support of his ineffective assistance of counsel claims, Owens provides his own affidavits, and those of Tim Blackman, Sheila Minor, and his mother, Bertha Marie Owens. Owens has presented two sets of these affidavits. He filed the first set with the state court on September 11, 2003, in support of his *pro se* state petition for postconviction relief. The affidavits in the second set were prepared on dates ranging from 2006 to 2009. It is not clear from the record what occasioned the second set of affidavits or whether counsel participated in preparation of any of the affidavits.

Owens claims that he is innocent of the crime for which he was convicted. (Aug. 26, 2003 Owens Aff. ¶ 2, Ex. A to Pet'r's Reply.) He further asserts that he repeatedly told his trial counsel, Frank Rago, that he was innocent, that he had an alibi, and that he had alibi witnesses (Blackman and Minor). (*Id.* ¶ 3.) According to Owens, Rago promised that he would investigate Owens's alibi and interview his alibi witnesses, and would call Owens and the alibi witnesses to testify on Owens's behalf. (*Id.* ¶ 4.) Despite these assurances, Owens contends, Rago failed to investigate

or interview the alibi witnesses, and in fact forbade Owens from testifying on his own behalf.  (*Id.*)[1]

Owens explains that although he wanted to testify, Rago told him "not to worry, meaning that [Owens] would be acquitted." (Jan. 11, 2008 Owens Aff. ¶ 4.)  Owens asserts that neither Rago nor Judge Macellaio explained that he had the right to testify or that the decision on whether to testify was Owens's alone.  (*Id.* ¶¶ 5-6.)  According to Owens, had he known this was his decision to make, he would have testified, and explained that he was innocent and had an alibi.  (*Id.* ¶ 7.)

In his affidavit, Tim Blackman provides an account of his time with Owens on September 22-23, 1999.  According to Blackman's account, at 2:30 p.m. on September 22, 1999, he and Owens were in front of Owens's house in Markham, Illinois when Sheila Minor drove by and asked them to help her assemble a dinette set later that evening.  (July 18, 2003 Blackman Aff. ¶¶ 2-3, Ex. B to Pet'r's Reply.)  Blackman and Petitioner met Minor at her father's house, down the street from Owens's home, at 6:15 p.m.  (*Id.* ¶ 4.)  From there, Minor gave Blackman and Owens a ride to Minor's home in Sauk Village, Illinois.  (*Id.* ¶ 5.)  They arrived at Minor's home at 7:20 p.m., assembled the dinette set, and then spent the remainder of the evening talking, eating, and watching television.  (*Id.* ¶ 6.)  Instead of heading back to Markham that evening, Blackman and the Owens spent the night at Minor's home, staying until 6:00 a.m. the following morning.  (*Id.* ¶¶ 8, 9.)  Blackman says that prior to trial, he assured Owens's mother that he would testify to these events, but Owens's attorney never contacted, interviewed, or asked Blackman to testify.  (*Id.* ¶¶ 10, 11.)

Tim Blackman's second affidavit, prepared several years later, provides an account similar, though not identical, to the one set forth in his initial affidavit.  According to that second affidavit, Blackman and Owens began their day at Blackman's home, not at Owens's home, and returned

---

[1]	Owens has also asserted that Rago did not prepare Owens to testify before calling him as a witness at the hearing on his motion to quash the arrest.  (Jan. 11, 2008 Owens Aff. ¶ 3, Ex. F to Pet'r's Reply.)  Owens does not, however, advance this argument in his federal habeas petition.

at 8:00 a.m., not 6:00 a.m., the following day.   (Aug. 23, 2006 Blackman Aff. ¶¶ 7, 12, Ex. G to Pet'r's Reply.)

Sheila Minor also provided affidavits recounting her time with Owens and Blackman on September 22-23, 1999, the details of which mirror those set forth in Blackman's first affidavit.  (July 18, 2003 Minor Aff., Ex. C to Pet'r's Reply.)   Like Blackman, Minor was never contacted or interviewed by Owens's attorney and was never called to testify on Owens's behalf.  (*Id.* ¶ 11.)  Minor's second affidavit repeated her earlier account.  (Jan 22, 2007 Minor Aff., Ex. H to Pet'r's Reply.)

Finally, Petitioner's mother, Bertha Marie Owens, provided affidavits concerning her active involvement in Petitioner's defense.  Ms. Owens asserts that she told Frank Rago numerous times that Blackman, Minor, and her son wanted to testify and could provide an alibi defense.  (Sept. 10, 2003 Ms. Owens Aff. ¶ 3, Ex. D to Pet'r's Reply.)  She supplied Rago with Blackman's and Minor's names and contact information, but despite his numerous assurances about presenting the alibi defense, he never interviewed them or investigated the alibi.  (*Id.* ¶¶ 4-5.)  According to Ms. Owens, Rago decided not to use the alibi defense because, he told her, the prosecutor's case against her son was too weak and he would never be convicted.  (*Id.* ¶ 6.)  Ms. Owens's second affidavit presents the same information.  (Oct. 31, 2006 Ms. Owens Aff., Ex. I to Pet'r's Reply.**)**

## PROCEDURAL HISTORY

Following trial, Owens appealed to the Illinois Appellate Court, First District.   On direct appeal, Petitioner argued (1) that Petitioner was not proven guilty beyond a reasonable doubt; (2) that Petitioner's arrest and the lineup evidence should have been suppressed because the police had no probable cause to arrest for the murder charge; (3) that the photo array and lineup evidence should have been suppressed because they were overly suggestive; (4) that the judge's extrajudicial findings concerning Owens's motive for the crime denied Petitioner a fair trial; (5) that Petitioner was denied the effective assistance of counsel; and (6) that the sentence was excessive.

(Pet'r's Direct Appeal Brief at 15, 25, 30, 32, 34.)  Concerning Owens's ineffective assistance of counsel claim, his brief noted that his claim was limited on direct appeal to evidence in the trial record, which precluded consideration of evidence of his desire to testify or the availability of alibi witnesses.  (*Id.* at 33 n.3.)  In a 2-1 decision, the Illinois Appellate Court affirmed the trial court's judgment on December 4, 2002.  (Direct Appeal Order at 34.)

The court concluded that police had probable cause for both the warrantless arrest for the traffic violations and the subsequent arrest for murder based on the eyewitness identifications.  (*Id.* at 17-18.)  Further, the court held that Owens had waived his right to the admission of the photo-array and lineup identifications by failing to raise a trial objection, and that in any event, Owens failed to establish that the identification procedures were impermissibly suggestive.  (*Id.* at 19-22.)  Concerning the sufficiency of the evidence, the court noted that the prosecution could carry its burden through the testimony of a single, credible eyewitness.  (*Id.* at 22.)  Although the court noted that Evans's testimony was "severely called into question"—both by his misidentification of Owens's photograph in the photo array at trial and by his deal to testify in exchange for a recommendation of lenient sentencing in his own criminal trial—the court concluded that "Johnnie's identification testimony is reliable and sufficient enough to support the trial court's guilty verdict." (*Id.* at 25-26.)  In light of the identifications, the majority concluded that "the trial court's speculation as to defendant's motive for assaulting Nelson, will be construed as harmless error." (*Id.* at 27.)  The dissenting judge disagreed with this analysis; the dissent observed that the trial judge had "manufactur[ed], suppl[ied], and interject[ed] its own evidence into a trial and then affirmatively stat[ed] on the record that this manufactured evidence constituted the basis of its verdict." (*Id.* at 37 (South, J., dissenting).)  Finally, the Illinois appellate court rejected Owens's ineffective assistance of counsel claim on direct appeal.  In the absence of the post-trial affidavit testimony mentioned above, the court concluded that Owens failed to point to anything in the trial record "which indicates that defense counsel failed to investigate the case" or "that defendant ever

13

expressed a desire to testify or that defense counsel frustrated defendant's request to testify." (*Id.* at 31-32 (majority opinion).)

Owens filed a Petition for Leave to Appeal ("PLA") with the Illinois Supreme Court on January 8, 2003. (Lawrence Owens's Pet. for Leave to Appeal, Ex. E to Resp't's Answer.) Owens sought review only of the appellate court's conclusion that the evidence was sufficient for conviction and that the trial court's extrajudicial finding concerning Owens's motive was harmless error. (*Id.* at 1.) Petitioner also attempted to preserve other errors not raised in the PLA by stating that "several other instances of trial error were fully briefed in the Appellate Court, but space limitations here prevent discussion. If this Petition is granted, defendant wishes to preserve those issues which were presented as well in the appellate court, in a supplemental brief." *Id.* at 3-4.) The Illinois Supreme Court denied Owens's PLA on April 2, 2003. *People v. Owens*, 203 Ill.2d 563, 788 N.E.2d 733 (2003).

After his unsuccessful direct review concluded, Owens pursued further review by way of a petition for post-conviction relief. Owens filed a *pro se* petition on September 10, 2003. (Pet. for Writ of Habeas Corpus (hereinafter "Habeas Pet."), at 3.)[2] A number of years later, counsel filed a supplemental petition for posconviction relief on Owens's behalf on June 16, 2008. Owens claimed that he was deprived of effective assistance of counsel because Rago, his trial counsel, neither investigated his alibi nor called alibi witnesses to testify at trial, and because Rago forbade Petitioner from testifying on his own behalf. (Supplemental Pet. for Post-Conviction Relief, Ex. G

---

[2]    No copy of this *pro se* petition appears in the record, but Respondent does not dispute that it was filed.

to Resp't's Answer, at 1-2.)[3]  In support of his petition, Owens submitted the post-trial affidavit testimony discussed above.

While his state postconviction petition was still pending, Owens filed the instant habeas petition on December 15, 2008.  Respondent moved to dismiss the petition due to Petitioner's failure to exhaust his state court remedies.  (Motion to Dismiss [18].)  Owens cited "inordinate delay" to explain his decision to file a federal habeas petition before his state petition, then pending more than five years, had been resolved.  (Habeas Pet. at 3.)  This court initially delayed ruling on the motion to dismiss, in the hope that completion of the state court process would render Respondent's motion moot.  On March 9, 2010, however, the court denied Respondent's motion, noting that despite Petitioner's diligence "in making contact with his lawyers, seeking information from them, and urging action," the state trial court had taken more than six years to rule on the petition, and no further ruling was in sight.  (Mar. 9, 2010 Minute Order [24].)  Although some of the delay was evidently attributable to his appointed counsel, this court noted that the state trial court was also responsible for delays, for reasons that appeared unrelated to any request made by Owens or his attorneys or by the state.  (*Id.*)

During the pendency of this federal habeas petition, Petitioner's state postconviction petition continued to wind through the state courts.  In its oral ruling, rendered on September 29, 2009, the

---

[3]        Petitioner's counsel later filed an amended supplemental petition in which Petitioner claimed, pursuant to the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1(a)(1), and the due process clause of the Illinois Constitution, *see People v. Washington*, 171 Ill. 2d 475, 489, 665 N.E.2d 1330, 1337 (1996), that he was actual innocent based on newly discovered evidence.  (Am. Supplemental Pet. for Post-Conviction Relief, Ex. H to Resp't's Answer, at 1.)  The trial court ultimately dismissed Owens's petition on this ground.  (Brief and Argument for Petition-Appellant in *People v. Owens*, No. 1-09-2626 (hereinafter "Pet'r's Postconviction Appeal Brief"), Ex. J to Supplemental Index of State Court Record Exhibits (hereinafter "Supplemental Record"), at 12.) It is not clear from the record on what grounds the trial court rejected Petitioner's actual innocence claim, but the court notes that the affidavits from Blackman and Minor do not constitute "newly discovered evidence" because the facts to which they attest were available to Petitioner at the time of his trial.  Petitioner did not challenge the trial court's determination of his actual innocence claim on appeal.

state trial court explained that because Petitioner raised ineffective assistance of counsel claims on direct appeal, the postconviction petition claims were barred by *res judicata*. (Pet'r's Postconviction Appeal Brief, at 12; Certified Report of Disposition in *People v. Owens*, No. 99 CR 25287-01, App. to Pet'r's Postconviction Appeal Brief, at A-7.) Petitioner appealed this decision to the Illinois appellate court, arguing that the trial court erred in dismissing his petition without an evidentiary hearing. (Pet'r's Postconviction Appeal Brief at 1.) Further, Petitioner asserted that the court erred in applying the doctrine of *res judicata* because Petitioner's state postconviction petition presented evidence outside the trial record, not available to the Illinois appellate court or the Illinois Supreme Court on direct appeal. (*Id.* at 27.)

The Illinois appellate court denied Petitioner's appeal on March 21, 2011. (Summary Order in *People v. Owens*, No. 1-09-2626 (Ill. App. 1st Dist. Mar. 21, 2011) (hereinafter "Postconviction Order"), Ex. M to Supplemental Record.) The court acknowledged that under Illinois law, "[*r*]es *judicata* does not bar a defendant from raising an ineffective assistance claim in a petition for postconviction relief if the claim is based on evidence outside the record." (*Id.* at 2 (citing *People v. Ward*, 187 Ill. 2d 249, 257, 718 N.E.2d 117, 124 (1999)).) Nevertheless, the court concluded that the post-trial affidavits "do not constitute evidence outside the record sufficient to preclude the application of *res judicata* to this claim." (*Id.* at 3.) The court characterized counsel's decision not to investigate and present alibi witnesses, and instead to present no evidence in Owens's defense at all, as a "tactical choice made on the basis of strategic considerations." (*Id.* at 3.) Further, the court concluded that Petitioner had not alleged that he asserted his right to testify on his own behalf and that he had not established how absence of his testimony prejudiced his defense. (*Id.* at 4.)

Following this appeal, Petitioner filed a Petition for Rehearing on March 31, 2011 (Ex. N to Supplemental Record), which the appellate court denied on June 22, 2011. (Ex. O to Supplemental Record.) Finally Petitioner filed a PLA with the Illinois Supreme Court. (Ex. P to Supplemental Index.) The PLA was denied on September 28, 2011. (Ex. Q to Supplemental Record.)

<u>**DISCUSSION**</u>

In his petition to this court, Owens claims that (1) the long delay in resolution of his state court postconviction petition violated his due process rights; (2) there was no probable cause to arrest him; (3) the trial court should have suppressed the photo array and lineup evidence because it was improperly suggestive; (4) the trial court made improper "extrajudicial" findings regarding Owens's motive, basing its finding of guilt on evidence not produced at trial; and (5) trial counsel provided ineffective assistance of counsel.   In response, Respondent argues that an "inordinate delay" claim (Claim 1) is not cognizable on habeas review; that rejection of Owens's "extrajudicial findings" claim (Claim 4) was not an unreasonable application of, or contrary to, United States Supreme Court precedent; and that the remaining claims (Claims 2, 3, and 5) are procedurally defaulted.  This court addresses the threshold issues raised in Respondent's answer—whether the claims are cognizable or procedurally defaulted—before considering the merits of those claims that are appropriately before this court.

**I.     Threshold Issues**

**A.     Cognizablility**

Respondent is correct that the long delay in resolution of Owens's state postconviction petition does not support habeas relief.  The object of habeas corpus relief "'is not to make whole someone who has suffered a loss,' but 'to determine whether a person is being confined in violation of basic norms of legality.'"  *Jackson v. Duckworth*, 112 F.3d 878, 880 (7th Cir. 1997) (quoting *Allen v. Duckworth*, 6 F.3d 458, 460 (7th Cir. 1993)).  Accordingly, "'delay in receiving a ruling on a discretionary state collateral appeal is not a ground for federal habeas corpus relief.'"  *Id.* (quoting *Montgomery v. Meloy*, 90 F.3d 1200, 1206 (7th Cir. 1996)).  Thus, habeas relief is denied on this claim (Claim 1).

### B.        Procedural Default

Analysis of Respondent's procedural default argument is more complicated. Before seeking habeas review, a petitioner must exhaust available state remedies. 28 U.S.C. § 2254(b). Courts interpret this provision to require a petitioner to "'fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" *Johnson v. Pollard*, 559 F.3d 746, 751 (7th Cir. 2009) (alteration in original) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)). To fairly present his federal claim, a petitioner must put the claim through one complete round of the State's established appellate review process. *Id.* at 752 (citing *Woodford v. Ngo*, 548 U.S. 81, 92 (2006)). "Failure to do so precludes review by federal courts." *Id.*

Petitioner has not challenged Respondent's contention that Petitioner's challenge to probable cause for arrest (Claim 2) and to the identification procedures (Claim 3) were presented only to the Illinois appellate court, and were not explicitly argued in Petitioner's direct appeal PLA to the Illinois Supreme Court. Petitioner wisely does not argue that the "catch-all" language in his PLA, purporting to preserve errors not included due to space constraints, preserves these errors for habeas review. Those claims for habeas relief are procedurally defaulted.

Respondent also argues that Petitioner's ineffective assistance of counsel claims are procedurally defaulted. Respondent is correct that Petitioner did not raise these claims in his direct appeal PLA. Respondent filed his brief before the resolution of the postconviction petition, however. That petition did present his ineffective assistance claims, which Petitioner then raised in both the Illinois appellate court and the Illinois Supreme Court. Thus, the claims were subject to a full round of review.

Respondent argues that *res judicata*, under Illinois law, bars Petition from asserting these ineffective assistance claims. But the Seventh Circuit has "'repeatedly held that res judicata is not a bar to consideration of claims in a federal habeas action.'" *Davis v. Lambert*, 388 F.3d 1052, 1058

18

(7th Cir. 2004) (quoting *Moore v. Bryant*, 295 F.3d 771, 776 n.1 (7th Cir. 2002)).  In doing so, the Seventh Circuit has concluded that a state court's determination on postconviction review that a petitioner's ineffective assistance claim is barred by *res judicata* is not an "adequate and independent state ground for rejecting the petition." *Id.*  "'[F]ederal review is precluded only by procedural forfeitures, not by *res judicata* concerns." *Id.* (citing *Page v. Frank*, 343 F.3d 901, 907 (7th Cir. 2003)).  Because Petitioner's ineffective assistance claims were fully and fairly presented through one complete round of state court review, they are not procedurally defaulted.

## II.      Merits Analysis

Two of the five claims survive to be decided on the merits:  the claim that the court made improper "extrajudicial" findings regarding petitioner's motive and the ineffective assistance of counsel claims.  Where the state courts deny a petitioner's federal claim on the merits, a federal court may grant habeas relief only where the state courts' decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010). The Seventh Circuit has observed that a review for reasonableness "is highly deferential; indeed, 'a state decision may stand as long as it is objectively reasonable, even if the reviewing court determines it to be substantively incorrect.'" *Morgan v. Hardy*, 662 F.3d 790, 797 (7th Cir. 2011) (quoting *Barrow v. Uchtman*, 398 F.3d 597, 602 (7th Cir. 2005)); *see also Harding v. Sternes*, 380 F.3d 1034, 1043 (7th Cir. 2004) ("A federal habeas court must find that the state's application of federal law was unreasonable and not simply erroneous or incorrect.").  To be "objectively unreasonable," a state court's decision must fall "'well outside the boundaries of permissible differences of opinion.'" *Morgan*, 662 F.3d at 797 (quoting *Watson v. Anglin*, 560 F.3d 687, 690 (7th Cir. 2009)).  The petitioner bears the burden to show that the state courts' application of federal law was unreasonable.  *Sturgeon v. Chandler*, 552 F.3d 604, 609 (7th

Cir. 2009) (citing 28 U.S.C. § 2254(e)(1); *Harding*, 380 F.3d at 1043).  Where, however, the state court's adjudication of the claims was not on the merits, a federal habeas court reviews the claims *de novo.  Cone v. Bell*, 556 U.S. 449, 472 (2009).

### A.    Improper Extrajudicial Findings

Petitioner claims he was deprived of a fair trial when, while announcing the verdict, the trial court judge made extrajudicial findings regarding Petitioner's motive to commit the murder.  On direct appeal, the appellate court concluded that the judge's comments were not based on the evidence because there was  "no evidence presented that [Owens] knew Nelson was dealing drugs, and there was no evidence presented that [Owens] was involved with gangs or the illegal drug trade." (Direct Appeal Order at 25.)  Nevertheless, the majority of the appellate panel determined that the trial court's speculation as to Owens's motive for assaulting Nelson constituted harmless error because the eyewitness testimony was reliable enough to sustain the conviction.

Petitioner bears the burden to show that the state courts' decision violates the Constitution. Petitioner has asserted that he was denied a fair trial because the judge's extrajudicial findings were based on his personal opinion, bias, or prejudice.  (Habeas Pet. at 7.)  Beyond this initial assertion, however, the Petitioner does little to advance this line of argument.  In Petitioner's *pro se* reply brief, he asserts that the extrajudicial findings were "racist."  (Pet'r's Pro-Se Habeas Corpus Reply Pet. [52], at 3.)  Later, in a brief prepared by counsel, Petitioner does not even address the trial court's extrajudicial findings, and instead focuses on his ineffective assistance of counsel claim.  Thus, Petitioner has not identified any Supreme Court precedent that the Appellate Court allegedly applied in an unreasonable or contrary way.  Petitioner's failure to carry his burden is, alone, enough reason to deny habeas relief on his "extrajudicial findings" claim.

Even if Plaintiff could establish that extrajudicial findings by a state court judge violated a clearly established Supreme Court precedent, the relevant inquiry is whether the appellate court's determination that the extrajudicial findings were harmless error was a reasonable application of

*Chapman v. California*, 386 U.S. 18 (1967). *See Johnson v. Acevedo*, 572 F.3d 398, 404 (7th Cir. 2009) (explaining that where a state court conducted a harmless error analysis, the question for federal courts is whether it was a reasonable application of *Chapman*). Under *Chapman*, in order for a constitutional error to be considered harmless, it must be considered harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24.

The appellate court's harmless error analysis was not an unreasonable application of *Chapman*. In discussing the evidence, the Appellate Court reviewed the testimony of the two eyewitnesses in detail. The Appellate Court thought it significant that a witness within a few feet of the attack had ample opportunity to observe the assailant. Additionally, although their testimony was not entirely consistent, each of the two witnesses positively put the Petitioner at the scene. With such evidence, it is not unreasonable for the appellate court to determine the error of motive speculation as harmless beyond a reasonable doubt. As the Petitioner made no substantive argument to further his claim, and the appellate court applied Supreme Court precedent in a reasonable manner, habeas relief on Count 4 is denied.

### B.     Ineffective Assistance of Counsel

The court turns, finally, to the ineffective assistance claims. Petitioner claims trial counsel was ineffective in (1) failing to investigate, interview, or call alibi witnesses to testify and (2) failing to put Petitioner on the stand at trial.[4] "'[T]he right to counsel is the right to the effective assistance of counsel.'" *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). To establish a claim under *Strickland*, Petitioner must show he received deficient assistance, and that this deficiency resulted in prejudice. *Morgan*, 662 F.3d at 802.

---

[4]     Petitioner does not raise his trial counsel's failure to object to the photo array and lineup identifications as additional grounds for an ineffective assistance argument.

Deficiency is established where the attorney's performance falls below "an objective standard of reasonableness." *Id.* (citing *Strickland*, 466 U.S. at 688). Review of an attorney's performance is "highly deferential and reflects a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . . So long as an attorney articulates a strategic reason for a decision that was sound at the time it was made, the decision generally cannot support a claim of ineffective assistance of counsel." *Yu Tian Li v. United States*, 648 F.3d 524, 527-28 (7th Cir. 2011).

To establish prejudice, Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Morgan*, 662 F.3d at 802 (citing *Strickland*, 466 U.S. at 694). The error must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* (citing *Strickland*, 466 U.S. at 687). "The likelihood of a different result must be substantial, not just conceivable." *Id.* Further, there is no need to consider the performance prong of the *Strickland* analysis if the court finds the prejudice prong cannot be satisfied. *Id.* (citing *Matheney v. Anderson*, 253 F.3d 1025, 1042 (7th Cir. 2001)).

This case presents complications in determining the appropriate level of deference toward the state court's adjudication of Petitioner's ineffective assistance claims. Where a federal habeas court reviews a state court's adjudication of a petitioner's ineffective assistance claim on the merits, 28 U.S.C. § 2265(d) applies and the question is whether "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). When AEDPA's "highly deferential" standard for review of a state court's application of federal law applies in tandem with *Strickland*'s "highly deferential" standard for an attorney's performance, "review is 'doubly' so." *Id.* at 788 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). Thus, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is

whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

In this case, however, the state courts did not directly resolve the ineffective assistance argument on the merits, instead denying the postconviction petition on *res judicata* grounds. Although *res judicata* implies that the merits of the issue had already been decided, Petitioner's postconviction petition included factual assertions outside the trial record that could not have been part of his claims on direct appeal, a fact that the Illinois appellate court itself acknowledged. At no point during the state court postconviction proceedings did the state courts conduct an evidentiary hearing to evaluate the merits of Petitioner's ineffective assistance claims. This court is inclined to take the state courts at their word: denial of the ineffective assistance claims in Petitioner's postconviction petition was based on *res judicata*. Furthermore, the Illinois appellate court never addressed *Strickland*'s prejudice prong with regards to Owens's postconviction petition on the grounds that Rago did not *call* alibi witnesses to testify, and did not address Rago's alleged failure to *investigate* Owens's alibi at all. In similar cases, the Supreme Court has reviewed habeas petitions *de novo*. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (applying *de novo* review where the state courts did not address *Strickland*'s prejudice prong); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (same). As the court explains here, the state court's application of *Strickland* in its *res judicata* analysis appears inadequate under either standard of review.

### 1.    Failure to Investigate or Call Alibi Witnesses

On appeal from denial of his post-conviction petition, the Illinois appellate court rejected Petitioner's claim that his trial counsel was ineffective for failing to call his alibi witnesses to testify. According to that court, the new evidence submitted by Petitioner was "not sufficient to preclude the application of *res judicata*" because Petitioner had failed to demonstrate that Rago's decision to call Blackman and Minor to present an alibi defense was anything other than sound trial strategy. The court observed that Rago had been informed of the alibi testimony prior to trial, but that he

23

concluded that the testimony was unnecessary "after assessing the perceived weaknesses in the State's case." (Postconviction Order at 3.) Thus, the court concluded that Rago's decision to present no evidence in Petitioner's defense was a "tactical choice made on the basis of strategic considerations." (*Id.*)

Based on the uncontroverted evidence presented by Petitioner, however, this court cannot divine any reasonable argument that resting without presenting any evidence in Petitioner's defense is a sound alternative to presenting evidence that, if accepted by the trier of fact, would establish an absolute defense. This is not a situation where the presentation of certain evidence might undermine other defense evidence, or where counsel believes one defense to be stronger than or inconsistent with another. Petitioner's alibi defense was compatible with, and in fact considerably bolstered, the perceived weaknesses in the prosecution's case due to the credibility problems with the only witness for the prosecution who claimed familiarity with the assailant from before the incident—Evans. *See Malone v. Walls*, 538 F.3d 744, 761 (7th Cir. 2008) ("Especially when there are vulnerabilities in the prosecution's identification testimony, '[o]pposing testimony from other eyewitnesses . . . give[s] the jury a qualitatively different and more powerful reason to believe that the State's witnesses [a]re mistaken in their identifications.'" (quoting *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 250 (7th Cir. 2003))). Furthermore, the evidence does not support the conclusion that Rago made a strategic decision not to call alibi witnesses; according to the uncontroverted affidavit testimony submitted by Petitioner, Rago neither investigated Petitioner's alibi nor interviewed his alibi witnesses at all. Thus, it appears that Rago's decision not to call alibi witnesses was "one that occurred by default rather than design." *Hampton*, 347 F.3d at 249.

The Illinois appellate court did not address the prejudice prong with regard to trial counsel's failure to call alibi witnesses, but the court concludes that it is easily satisfied here. There was a substantial likelihood that the presentation of a persuasive alibi defense would have altered the outcome at trial in a case where the only evidence against Petitioner was testimony from two

eyewitnesses, one of whom–the only one who claimed previous familiarity with the assailant–had "severe[]" credibility problems. *Cf. Malone*, 538 F.3d at 761 (holding unreasonable a state appellate court's determination that a petitioner was not prejudiced when his counsel failed to call a witness who would have rebutted the testimony of the prosecution's witness); *Hampton*, 347 F.3d at 253 ("Given the central role that eyewitness testimony played in this case, the vulnerabilities of the testimony of the State's eyewitnesses, and the shortcomings in human perception that so frequently render eyewitness testimony less reliable than other types of evidence, we are more than satisfied that the failure to investigate exculpatory eyewitnesses likely affected the outcome of [the petitioner's] trial." (citation omitted)).

Failure to *call* alibi witnesses was only one aspect of petitioner's ineffective assistance argument. The Illinois appellate court did not in any fashion address Petitioner's claim that his trial counsel failed to *investigate* the alibi defense or to interview the alibi witnesses. This failure affords an independent basis for an ineffective assistance of counsel claim.

> The duty to investigate derives from counsel's basic function, which is "to make the adversarial testing process work in the particular case." "Because that testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, [the Supreme Court has] noted that counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."

*Hampton*, 347 F.3d at 247 (alteration in original) (citations omitted) (quoting *Kimmelman v. Morrison*, 477 U.S. 365 (1986)) (internal quotation marks omitted). If Petitioner's counsel did not investigate Petitioner's alibi, as Petitioner's unchallenged post-trial affidavits attest, Petitioner's defense was prejudiced for the same reasons described above with respect to Petitioner's failure-to-call-alibi-witnesses claim.

The court is nevertheless unwilling to assume that the affidavits Petitioner presents to substantiate his ineffective assistance claims are sufficient to support habeas relief without further investigation. One of those affidavits is from Petitioner himself, and another from his mother.

Although the other affiants do not have the same obvious motive to fabricate evidence, their exculpatory assertions have never been subject to cross-examination. Additionally, the record contains no testimony from Petitioner's trial counsel either affirming or denying Petitioner's factual assertions about counsel's performance. An evidentiary hearing is necessary to give both Petitioner and the State an opportunity to develop evidence concerning his trial attorney's performance.

In reaching this conclusion, the court recognizes the limitations imposed by AEDPA on a federal habeas court's authority. If, under § 2254(d), a federal court is limited to reviewing a state court's "adjudication on the merits," recent Supreme Court precedent would preclude this court from holding an evidentiary hearing. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) ("review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"). Accordingly, where the state courts have dismissed a collateral challenge on the merits without holding an evidentiary hearing, but in doing so have unreasonably misapplied clearly established federal law to the petitioner's evidence, it appears (somewhat perversely) that his court would have no choice other than to grant habeas relief–in spite of the possibility that the petitioner's (and his witnesses') assertions are complete fabrications. As noted above, however, the state court here rested its determination of the ineffective assistance claim on *res judicata* grounds, and did not decide the claim on its merits. At a minimum, it is clear that state courts did not address Petitioner's failure-to-investigate claim and did not address the prejudice prong for Petitioner's failure-to-call-alibi-witnesses claim, and therefore did not adjudicate those claims on the merits.

Even outside of § 2254(d), AEDPA generally bars federal courts from holding evidentiary hearings to supplement the record. 28 U.S.C. § 2254(e)(2). Where, however, "the 'fail[ure] to develop the factual basis of a claim in State court proceedings' can not be attributed to something the petitioner 'did or omitted,' Section 2254(e)(2) does not apply and it is then necessary to evaluate the request for an evidentiary hearing under pre-AEDPA standards." *Matheney*, 253 F.3d at 1039 (alteration in original). "Under pre-AEDPA standards, a federal evidentiary hearing is required if (1)

26

a habeas petitioner alleges facts which, if proved, would entitle him to relief and (2) the state courts—for reasons beyond the control of the petitioner—never considered the claim in a full and fair hearing." *Id.* (citing *Porter v. Gramley*, 112 F.3d 1308, 1317 (7th Cir. 1997)).

The court is satisfied that Petitioner meets these requirements. Trial counsel's failure to interview or call alibi witnesses did not appear on the face of the trial court record, and direct appeal was limited to review of that record—a principle that Petitioner's appellate counsel mentioned in the brief on direct appeal. Petitioner's requests for a evidentiary hearing on state postconviction review were denied even though Petitioner diligently came forward with affidavit testimony that, if true, would establish that trial counsel failed to provide effective assistance. Because the facts concerning his attorney's performance are undeveloped, the state courts never had the opportunity to consider Petitioner's ineffective assistance of counsel claims in a "full and fair hearing." Under circumstances similar to these, the Seventh Circuit vacated a district court's order denying habeas relief and remanded for an evidentiary hearing. *See, e.g.*, *Davis*, 388 F.3d at 1058-67 (concluding that a petitioner was entitled to an evidentiary hearing where the Illinois appellate court dismissed the petitioner's *Strickland* claim on *res judicata* grounds without conducting an evidentiary hearing). The court concludes Petitioner is entitled to an evidentiary hearing on his claim that trial counsel was ineffective for failing to investigate Petitioner's alibi and for failing to call alibi witnesses.

### 2.    Petitioner's Right to Testify

On postconviction appeal, the Illinois appellate court also rejected Petitioner's ineffective assistance claim predicated on his trial counsel's refusal to let Petitioner testify on his own behalf. The court cited *People v. Barkes*, 399 Ill. App. 3d 980, 989, 928 N.E.2d 102, 112 (2d Dist. 2010), for the proposition that Petitioner was required to assert his right at trial, which Petitioner did not do. Under Illinois law, a criminal defendant's "conviction cannot be reversed on the basis that he was prevented from exercising that right unless he contemporaneously asserted his right to testify by informing the trial court that he wished to do so." *People v. Smith*, 176 Ill. 2d 217, 234, 680 N.E.2d

27

291, 302 (1997); *see also Thompson v. Battaglia*, 458 F.3d 614, 619 (7th Cir. 2006) (recognizing

Illinois as among the jurisdictions that require "a defendant to protest a lawyer's refusal to allow her

to testify during trial to preserve the right"). The court also noted that Petitioner's affidavit did not

indicate "how or when defendant informed counsel of his alleged desire to testify." (Postconviction

Order at 4.) Additionally, the Illinois appellate court concluded that Petitioner had failed to explain

how the absence of his testimony prejudiced his defense.

Under clearly establish Supreme Court precedent, "[a] criminal defendant's right to testify is

'a fundamental constitutional right.'" *Thompson*, 458 F.3d at 619 (quoting *Rock v. Arkansas*, 483

U.S. 44, 53 n.10 (1987)). Although a criminal defendant may waive that right, Petitioner contends

that his trial counsel forbade him from testifying, and that neither his trial counsel nor the judge

explained that the decision to testify was his alone. In his sworn affidavits, Petitioner asserts that

had he been allowed to testify, he would have asserted his "actual innocence" and explained that

he had an alibi defense.[5] Had he so testified, there is at least a reasonable probability that his alibi

defense would have altered the outcome at trial; as noted above, the eyewitness testimony that

provided the sole evidence against Petitioner was not overwhelming. In the absence of testimony

from alibi witnesses, Petitioner's testimony on his own behalf would have been the only opportunity

the court had to hear Petitioner's alibi defense. This court concludes that the Illinois appellate

---

[5]        Petitioner's proposed testimony is distinguishable from the proposed testimony described in *Barkes*, the case cited by the Illinois appellate court in support of its conclusion on prejudice. In *Barkes*, a criminal defendant convicted of criminal sexual assault and aggravated criminal sexual abuse failed to establish prejudice where the "defendant did not indicate that had he been called to testify he would have stated that he did not have sexual intercourse with [the victim] or that he was not in a position of trust, authority, or supervision over her, the central issues in the case." *Barkes*, 399 Ill. App. 3d at 990, 980 N.E.2d at 113. Similarly, *Barkes* relied on a case in which the court found no prejudice where the defendant, accused of biting a police officer, "did not indicate that, if he had been called to testify, he would have stated that he had no altercation with the officer, that the officer's finger was injured before the altercation began, or that he did not bite the officer." *People v. Youngblood*, 389 Ill. App. 3d 209, 218, 906 N.E.2d 720, 728 (2009) (2d Dist. 2009). In this case, in contrast, Petitioner alleges that he would have testified that he was not even in the same city as Nelson at the time Nelson was murdered.

court's conclusion that Petitioner did not explain how absence of his testimony prejudiced him appears to be an unreasonable determination of the facts and an unreasonable application of *Strickland*.

Further, Petitioner appears to have adequately pleaded facts sufficient to justify an evidentiary hearing on an ineffective assistance claim predicated on the denial of his right to testify. The Seventh Circuit has "steer[ed] a middle course" between courts, such those in Illinois, which require a criminal defendant to protest at trial counsel's refusal to allow the defendant to testify, and those jurisdictions that "require judges to inquire of defendants directly whether they want to testify." *Thompson*, 458 F.3d at 619. The Seventh Circuit requires "a defendant who wishes to raise this claim to meet a heightened pleading standard before the court must hold an evidentiary hearing on the question of waiver." *Id.* Under this heightened pleading standard, "a 'barebones assertion by a defendant, albeit made under oath, is insufficient'; something more, such as an affidavit from the lawyer who allegedly forbade his client to testify, is required." *Id.* (quoting *Underwood v. Clark*, 939 F.2d 473, 476 (7th Cir. 1991)). Petitioner does not present an affidavit from his trial counsel, but he does provide more than just his own sworn affidavit to substantiate his claim. Although the court notes the affiant's obvious conflict of interests, Petitioner presents sworn testimony from his mother, who appears to have participated in Petitioner's defense preparation. Ms. Owens testifies that she informed Petitioner's trial counsel several times that her son wanted to testify, but that at trial, counsel declined to present any evidence or to call his client to the stand. Petitioner's claim is bolstered by Minor's and Blackman's affidavits, which suggest that counsel's performance was deficient in other respects. Even if Petitioner's evidence supporting his right-to-testify claim were not sufficient on its own to merit an evidentiary hearing, this claim obviously overlaps with the failure-to-call-alibi-witnesses and failure-to-investigate claims. The court will conduct a single evidentiary hearing on all of Petitioner's ineffective assistance claims.

**CONCLUSION**

For the reasons state above, the court will convene an evidentiary hearing of limited scope to determine (a) whether trial counsel failed to investigate Petitioner's alibi defense, interview his alibi witnesses, or call his alibi witnesses to testify; and (b) whether, and to what extent, Petitioner understood his right to testify. All other claims are denied. With resolution of a constitutional issue pending an evidentiary hearing, the court declines to issue a certificate of appealability at this time. Status conference is set for Thursday, May 10, 2012, at 9:30 a.m. for purposes of scheduling.

ENTER:

Dated: April 23, 2012

REBECCA R. PALLMEYER
United States District Judge