Lawrence Owens,                          )
                                         )    No. 08 C 7159
                    Petitioner,          )
                                         )    Judge Thomas M. Durkin
        v.                               )
                                         )
Marc Hodge, Warden,                      )
Lawrence Correctional Center,            )
                                         )
                    Respondent.          )

### MEMORANDUM OPINION AND ORDER

Petitioner Lawrence Owens, an Illinois state prisoner serving a 25-year prison term for the first degree murder of Ramon Nelson, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Owens's petition, filed in December 2008, raised five claims that he alleged warranted habeas relief: (1) his due process rights were violated by the state court's delay in resolving his claims for state postconviction relief ("Claim 1"); (2) there was no probable cause to arrest him ("Claim 2"); (3) the trial court admitted a photo array and lineup identification that were both improperly suggestive ("Claim 3"); the trial court made improper "extrajudicial" findings regarding Owens's motive to commit murder and based its findings of guilt on evidence not produced at trial ("Claim 4"); and (5) trial counsel was ineffective for failing to investigate and call alibi witnesses and for misleading Owens regarding his right to testify ("Claim 5"). R. 1.

On May 29, 2012, the Court found Claim 1 to be non-cognizable; Claims 2 and 3 to be procedurally defaulted; and Claim 4 to lack merit. *Owens v. Acevedo*, No.

08 C 7159, 2012 WL 1416432, at *7-9 (N.D. Ill. May 29, 2012) (Pallmeyer, J.). The Court also ordered an evidentiary hearing on the ineffective assistance claim presented in Claim 5 and reserved ruling on whether a certificate of appealability should issue. *Id.* at *15.[1] On March 18 and 19, 2013, the Court conducted an evidentiary hearing. R. 125, 126. The parties completed their post-hearing briefing on January 9, 2014.

Based on the testimony and documentary evidence presented at the evidentiary hearing, and the credibility determinations the Court makes regarding the witnesses who testified, Owens's habeas petition is denied. The Court further declines to certify any issues for appeal.

## Background

### A.     Trial Evidence

Owens was convicted at a bench trial. The evidence introduced at trial was recounted by the state appellate court in its order affirming Owens's conviction on direct appeal, R. 152-1 at 136-49, and in the Court's prior opinion, *Owens*, 2012 WL 1416432, at *1-4 (Pallmeyer, J.). Absent clear and convincing evidence to the contrary, which Owens has not presented, these facts are presumed correct for purposes of federal habeas review. *See* 28 U.S.C. § 2254(e)(1); *Morgan v. Hardy*, 662 F.3d 790, 797 (7th Cir. 2011).

On September 22, 1999, at approximately 8:30 p.m., 17-year-old Ramon Nelson was beaten with a baseball bat outside a liquor store and lounge in

---

[1] On January 14, 2013, Owens's § 2254 petition was reassigned to the undersigned judge's calendar. R. 108.

Markham, Illinois. Nelson died as a result of this beating. Before the beating occurred, Maurice Johnnie was sitting in the passenger seat of his car with two friends; his friend Johnny Morgan was sitting in the driver's seat, and Morgan's friend was sitting in the backseat. The three were parked about ten feet from the entrance to the liquor store and were facing the direction of the store's front doors. The sun had gone down, but it was not quite dark yet, and the area in front of the store was illuminated by street lights and lights from the liquor store's front doors.

At one point, Morgan's friend exited the car and entered the liquor store. While Johnnie and Morgan waited in the car for him to return, Nelson pulled alongside the parked vehicle on a bicycle and began speaking with Morgan. Johnnie did not know Nelson. After Nelson and Morgan spoke for about three to five minutes, Nelson rode his bicycle past the front of the car, down the sidewalk, towards the entrance of the liquor store. Johnnie then saw a man, later identified as Owens, walking down the sidewalk in the opposite direction and toward Nelson. Nelson attempted to turn his bicycle around, but Owens caught up with him and struck him on the head with a baseball bat. Nelson fell from his bicycle into the doorway of the store, and as he lay on the ground, Owens forcefully struck him in the head a second time with both hands on the bat. After Owens had hit Nelson a second time, he turned and walked back in the direction from which he had come. Johnnie and Morgan exited their vehicle and went to aid Nelson, who was unconscious and groaning. Morgan insisted they take Nelson to the hospital where Nelson died the next day as a result of multiple skull fractures.

That night, William Evans was also on the same block as the liquor store. About a half hour before the attack, Evans had spoken to Nelson, whom he knew from the neighborhood. After talking with Nelson, he observed Nelson ride his bicycle toward the store's front entrance. At the time of the attack, Evans was retrieving a bucket at the northeast corner of the block to wash a car when he then heard a "wood splitting" sound. Evans looked back in the direction of the sound and saw Owens, who he did not know but recognized as someone who had previously been in the liquor store. Evans saw Owens strike Nelson twice on the head with a baseball bat. When Evans cried out, "hey, what is going on," Owens and another individual ran off past him. Evans went to aid Nelson and helped Johnnie and Morgan put Nelson into Johnnie's car. Immediately after the attack, Evans spoke with police, described the approximate height and weight of the two individuals he saw, and informed them that he recognized Owens from the neighborhood.

At trial, Evans revealed that he had a prior drug conviction for which he was on probation, and was in custody on another drug charge. He also acknowledged that he was testifying in exchange for State recommendations of probation on that pending drug charge and a recommitment of probation on the previous drug offense.

Johnnie did not speak with police officers that night, and when he dropped Nelson off at the hospital, he provided a false name and address. Responding officers to the crime scene, however, obtained the license plate number of the vehicle that transported Nelson to the hospital, and Detective Terry White was able to identify Johnnie from the vehicle's registration. About a week after the incident,

on September 28, 1999, Johnnie was interviewed at the Markham police station where he described Nelson's attacker as a large black male, approximately 6'2" to 6'4", weighing 220 to 240 pounds and dressed in brown clothing. Based on Johnnie's description, Detective White compiled a photo array of six men. From the photo array, Johnnie selected Owens's photo as the individual who attacked Nelson. Detective White stated at trial that at no time while Johnnie viewed the array did he ever suggest that the attacker was in the array or make any other suggestive remark. That same day, Evans viewed the photo array at the police station. He also described Nelson's attacker as a large black male, dressed in brown or tan clothing. Detective White testified that Evans identified Owens from the photo array as Nelson's attacker.

Following the photo identifications, the police were on the lookout for Owens in connection with Nelson's murder.[2] On October 26, 1999, Officer Mike Alexander observed a speeding vehicle. Officer Alexander activated his emergency lights and siren, and instead of stopping, the vehicle accelerated through a stop sign and proceeded down the road with Alexander in pursuit. When the vehicle finally pulled over, Owens exited the vehicle and ran. Alexander gave chase and apprehended Owens a block and a half later. At his motion to quash his arrest, Owen claimed

---

[2] The police did not obtain a warrant for Owens's arrest. Owens filed a motion to quash his arrest, arguing that the police lacked probable cause to effect his warrantless arrest on the homicide charge. The state appellate court found that based on Johnnie and Evans' photo array identifications, the police had probable cause to arrest and detain Owens for Nelson's murder. R. 152-1 at 151-52.

that he did not see Alexander's squad car until 30 seconds before he pulled over and that he walked, not ran, upon exiting his vehicle.

A day after Owens's arrest, Detective White arranged a five-man lineup for Johnnie and Evans to view. Each independently selected Owens from that lineup as Nelson's attacker. At trial, Detective White acknowledged that Owens was the only individual who appeared in both the photo array and lineup viewed by Johnnie and Evans. Johnnie testified that of the five individuals in the lineup, Owens was the "biggest and bulkiest" but that he did not select Owens out of the lineup based on height because everyone in the lineup was seated. When asked to view a photograph of the lineup at trial, Evans identified Owens as the man he had identified to Detective White the night he viewed the lineup, though earlier in his testimony, Evans had twice failed to identify the photo of Owens in the array he had selected at the police station.

The parties stipulated at trial that 40 bags of crack cocaine were found in Nelson's coat pocket. The defense rested without presenting any evidence. After hearing closing arguments, the state trial court convicted Owens of the first degree murder of Nelson, and then sentenced him to 25 years of imprisonment.

## B.    Postconviction Affidavits

After an unsuccessful round of direct appellate review of his conviction, Owens pursued further relief in state court by filing a postconviction petition.[3]

---

[3]  The Court's prior opinion recounts the claims that were raised in each round of review in Owens's direct appeal. *See Owens*, 2012 WL 1416432, at *5-6 (Pallmeyer, J.).

Owens filed his first petition *pro se* on September 10, 2003, and then through appointed counsel filed an amended petition on June 16, 2008 and an amended supplemental petition on November 7, 2008, claiming that trial counsel was ineffective for failing to interview and call alibi witnesses and for failing to allow Owens to testify at trial; Owens also raised an actual innocence claim. R. 152-2 at 24-111, 112-35.[4] In support of his ineffective assistance claim, Owens presented two sets of affidavits that each included affidavits from Owens, Timothy Blackman, Sheila Minor, and Owens's mother, Bertha Marie Owens. All the documents in the first set were dated in the summer months of 2003 and were filed with the state court on September 11, 2003; all the documents in the second set were signed on dates ranging from 2006 to 2009.

Owens asserted in his August 26, 2003 affidavit that he was actually innocent of Nelson's murder and that he repeatedly informed his attorney, Frank Rago of that fact. R. 152-2 at 55-56. According to Owens, he told Rago that he had an alibi for the night Nelson was murdered and that he had two witnesses who could corroborate that alibi—Blackman and Minor. *Id.* at 55. Owens further averred that Rago told him and his mother that he would investigate Owens's alibi witnesses and that he would "allow" Owens to testify in his own defense. *Id.* at 56. But, Owens says, Rago failed to investigate or interview his alibi witnesses and "forb[ade] [Owens] to testify [*sic*] in [his] own defense." *Id.* Owens added in his January 11, 2008 affidavit that "[a]lthough [he] felt [he] needed to testify at trial . . .

---

[4]  Owens's initial *pro se* postconviction petition was not included in the exhibits the Warden submitted to the Court.

Rago told [him] not to worry, meaning that [Owens] would be acquitted." *Id.* at 98. Owens claimed that neither Rago nor the trial judge explained that he had a right to testify at trial and that the decision regarding whether to testify was his. *Id.* And had he known it was his decision to testify, Owens adds, he would have testified that he did not murder Nelson and was with Minor and Blackman at the time. *Id.*

In his July 18, 2003 affidavit, Blackman details the time he and Owens spent together on September 22 and 23 in 1999. Blackman avers that at 2:30 p.m., he and Owens were standing in front of Owens's house when their mutual friend, Sheila Minor, drove by and asked them to help her assemble a new dinette set. *Id.* at 57. At about 6:15 p.m., Owens and Blackman met Minor at her father's home, and from there they drove to Minor's house where they arrived around 7:20 p.m. *Id.* At her house, Owens and Blackman assembled the dinette set and then spent the rest of the evening talking, eating, and watching television. *Id.* Around 10 p.m., Minor offered to drive Owens and Blackman home but also offered to let them spend the night and drive them home the following morning. *Id.* Owens and Blackman spent the night at Minor's home—they never left her home after they arrived—and Minor drove them home around 6 a.m. the next morning. *Id.* Blackman states in his affidavit that prior to trial, he spoke with Owens's mother and told her that he would testify to these events. *Id.* Owens's mother told Blackman that Owens's attorney would contact him, but Blackman averred that Rago never called, interviewed, or asked him to testify for Owens. *Id.*

Blackman's second affidavit, dated August 23, 2009, provides a fairly similar account, adding that Blackman and Owens met while they were high school students and that the two had known each other for 18 years. R. 152-2 at 101. According to Blackman, in September 1999, he and Owens saw each other three or four times a week, and on September 21, 1999, Owens and Blackman celebrated a friend's (Manny) birthday together. *Id.* Slightly different from his earlier affidavit, Blackman stated in his 2009 affidavit that on September 22, 1999, he and Owens met at Blackman's house—not Owens's house—and that they returned home from Minor's house the next day at 8 a.m.—not 6 a.m. *Id.* at 101-02. Blackman concludes his affidavit by saying that although the events described in the affidavit were from many years earlier, he was "certain of the dates," because he recalled celebrating Manny's birthday. *Id.* at 103.

Minor's affidavits recounted the night she spent with Owens and Blackman in a similar fashion. R. 152-2 at 58, 104-05. According to Minor, she was with Owens and Blackman at her house from 7:20 p.m. on September 22, 1999 to about 6 a.m. on September 23, 1999. *Id.* at 58, 104. Minor stated that Owens's attorney, Rago, never called, interviewed, or asked her to testify, though she would have been willing to do so. *Id.*

Bertha Marie Owens provided two affidavits, which discussed her involvement in Owens's defense. *Id.* at 59-60, 106-07. In her affidavits, she states that on several occasions, she informed Rago that Blackman, Minor, and Owens wanted to testify about Owens's alibi defense, and she provided Rago with

Blackman's and Minor's names and contact information. *Id.* at 59-60, 106. Yet Rago never interviewed them or investigated the alibi defense, despite assurances to Ms. Owens that he would. *Id.* Ms. Owens claimed that Rago decided not to use the alibi defense or allow Owens to testify because the case against Owens was "so weak . . . that he would never get convicted." *Id.* at 60; *see also id.* at 106.

### C. Procedural History

While his state postconviction proceeding was pending, Owens initiated this § 2254 proceeding on December 15, 2008. R. 1. The Warden moved to dismiss Owens's § 2254 petition based on Owens's failure to exhaust his available state court remedies. R. 18. Owens responded, citing the inordinate delay by the state courts in resolving his postconviction petition, which, at that point, had been pending for more than five years. R. 21. The Court appointed counsel to investigate the status of Owens's long-pending postconviction petition and to assist Owens with responding to the Warden's motion to dismiss. R. 57. On March 9, 2010, the Court denied the Warden's motion to dismiss, noting that while some of the delay was attributable to the conduct of his appointed attorneys, Owens had demonstrated that a ruling on his postconviction petition was delayed for reasons outside of Owens's control and that Owens had been diligent in urging action on that petition. R. 24. The Court then ordered the Warden to answer the § 2254 petition, *id.*, which the Warden did, R. 41.

Meanwhile, Owens's postconviction petition made its way through the state courts. In his postconviction appeal, Owens argued that trial counsel was ineffective

for failing to call Minor and Blackman to testify at trial and that he was deprived of his constitutional right to testify on his own behalf. R. 77 at 115-16. The state appellate court denied Owens's postconviction appeal on March 21, 2011, *id.* at 118-19, and Owens's round of postconviction review concluded when the Illinois Supreme Court denied Owens's petition for leave to appeal, raising the same claims raised in his postconviction appeal, on September 28, 2011, R. 77 at 151.

On May 29, 2012, the Court resolved a number of the claims raised in Owens's § 2254 petition, finding Claim 1 to be non-cognizable, Claims 2 and 3 to be procedurally defaulted, and Claim 4 to lack merit. *Owens*, 2012 WL 1416432, at *7-9 (Pallmeyer, J.). As to Claim 5, the Court found that the ineffective assistance allegations in Claim 5 were not procedurally defaulted and determined that an evidentiary hearing was necessary to ascertain (1) whether trial counsel failed to investigate Owens's alibi defense, interview his alibi witnesses, or call his alibi witnesses to testify on Owens's behalf; and (2) whether, and to what extent, Owens understood his right to testify. *Id.* at *10-14; *see also* R. 78.

The evidence offered at the evidentiary hearing conducted on March 18-19, 2013 included live testimony from Owens, Timothy Blackman, Owens's trial counsel Frank Rago, and Noel Zupancic, an investigator with the Cook County Public Defender's Office. The evidence also included the postconviction affidavits offered by Owens, Blackman, Minor, and Bertha Marie Owens[5] in support of Owens's

---

[5] Minor and Bertha Marie Owens died in 2007 and 2011, respectively. R. 126 at 62-65.

ineffective assistance claim and other documentary evidence relating to Rago and Zupancic's investigation into Owens's alibi defense.

**Analysis**

Owens is entitled to habeas relief if he is being held under a state court judgment obtained in violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Owens alleges habeas relief is warranted because his trial counsel was ineffective for two reasons: (1) counsel failed to investigate his alibi defense and relatedly, failed to call alibi witnesses to support that defense; and (2) counsel misled Owens regarding his right to testify at trial.

To prevail on a claim of ineffective assistance under *Strickland v. Washington*, Owens must demonstrate that (1) his trial counsel rendered deficient performance, meaning his representation fell below an objective standard of reasonableness; and (2) but for counsel's unprofessional errors or omissions, there is a reasonable probability the result of the trial would have been different. 466 U.S. 668, 694 (1984); *see also Brady v. Pfister*, 711 F.3d 818, 823 (7th Cir. 2013).

## I. Counsel's Failure to Investigate Owens's Alibi Defense and Call Timothy Blackman and Sheila Minor as Alibi Witnesses

### A. Factual Background

At the evidentiary hearing, Owens testified that he could not have committed the murder of Ramon Nelson on September 22, 1999 because he was with Timothy Blackman and Sheila Minor at Minor's house at the time the murder took place. R.

126 at 70-77.[6] According to Owens, on the afternoon of September 22, 1999, he saw his friend Tasha (last name then unknown) at 3 p.m.; he then saw his friends Karee Williams, Jamil, Greg, Kenworth, and Will (last names unknown) around 5 p.m. at Tasha's house. *Id.* at 129-32. After Owens left Tasha's house around 5:30 p.m., he then spent the remainder of the evening with Blackman and Minor at Minor's house assembling her furniture. *Id.* at 70-77. Owens claimed that he was with them from 6 p.m. on September 22, 1999 until 6 a.m. the following morning when Minor drove him and Blackman home. *Id.* He, Blackman, and Minor were childhood friends, and during that time period, they saw each other regularly. *Id.* at 124, 126, 156-58. Indeed, Minor was one of Owens's best friends, and after Owens's arrest and conviction, Minor visited Owens numerous times at the Cook County Jail and the Illinois Department of Corrections. *Id.* at 159-60.

Owens testified that after he was arrested, he told police that he had an alibi for the night of the murder, and when he met his attorneys, Rago included, he also told them about that defense. *Id.* at 78-85; *see also* R. 140-2 at 2. Owens said that he gave Rago several names of individuals who could corroborate his whereabouts that night—Blackman, Minor, Karee Williams, and Jamil, Will, Kenworth, and Tasha[7]—and followed up later with Rago regarding these individuals, further giving Rago the addresses of Blackman, Tasha, and Minor's father (Owens did not know Sheila

---

[6]  Citations to the transcripts of the evidentiary hearing are noted as R. 125 (the transcripts from March 18, 2013) and R. 126 (the transcripts from March 19, 2013).

[7]  Owens said at the hearing that when he gave Rago the names of his friends, he only gave Rago their first names because he did not know their last names. Through her investigation, Investigator Zupancic was later able to identify Tasha as Tasha Dugar. R. 125 at 136-38; R. 126 at 17-24.

Minor's address). R. 126 at 85-88, 99-100, 216-17. According to Owens, Rago told Owens that he had tried to locate Blackman, but Rago never told Owens that Blackman had said when Rago found him that he did not recall being with Owens on the night of the murder. *Id.* at 199-201. Owens added that he believed that he tried to contact Blackman to tell him to reach out to Rago, and he told Minor to talk to Rago when she visited him at the Cook County jail. *Id.* at 218. Owens further stated that when he asked Rago about the status of his alibi witnesses, Rago told Owens that he "didn't like" those witnesses, an explanation that Owens accepted. *Id.* at 110-11, 119.

Owens testified that after he was charged with murder but before his trial, he sent Rago a letter where he told Rago that he could not have committed the murder because he was not at the scene at the time. *Id.* at 135-37; *see also* Resp. Exh. 20, Letter from Owens to Rago dated February 19, 2000. Owens acknowledged that the letter did not mention that he was with Blackman, Minor, Tasha Dugar, or any of his other friends at the time of the murder. R. 126 at 138-40. After he was convicted, Owens sent Rago several more letters. *Id.* at 141-46; *see also* R. 140-3 at 4-10. Nowhere in those letters, where Owens sets forth several bases for a motion for a new trial, did Owens mention Tasha, Karee, Jamil, Greg, or Kenworth; nor did he say that he was with Blackman and Minor on the night of the murder, or challenge Rago's failure to investigate Owens's alibi defense. R. 126 at 146-52; *see also* R. 140-3 at 4-10. Indeed, nowhere in these letters did Owens indicate he was dissatisfied with Rago's representation of him. *Id.*

Rago testified that he became a licensed attorney in 1975. R. 125 at 31, 92. After he was licensed, Rago worked as an assistant public defender. *Id.* at 93. Around 1982 to 1983, he became a felony trial assistant at the Markham County courthouse where he worked until 2002. *Id.* at 94. During that time, the Public Defender's Office employed a system with four classification levels of attorneys. *Id.* at 31-32, 95. Attorneys classified as Level I attorneys were assigned to misdemeanor or traffic-level cases; Level II attorneys handled more serious misdemeanor cases; Level III attorneys were felony trial attorneys; and attorneys classified as Level IV attorneys were qualified to handle death-penalty cases. *Id.* at 31-32, 95. Rago was a Level IV attorney. *Id.* During Rago's almost 20-year career with the Public Defender's Office, Rago handled over 300 murder cases, 10 to 15% of which were trials, resulting in about 30 to 45 murder trials over the course of his career. *Id.* at 32-34, 97-98.

Rago testified that he began representing Owens sometime after Owens's October 1999 preliminary hearing. *Id.* at 100-01. Rago lacked specific recollection regarding much of his representation of Owens and of his investigation into Owens's case, and much of his testimony regarding his representation of Owens was based on his general practice at the time. *See Williams v. Lemmon*, 557 F.3d 534, 540 (7th Cir. 2009) (allowing for conclusion that a lawyer acted in accord with his normal practice). Rago testified that after assignment to Owens's case, he would have reviewed the report generated by the Assistant Public Defender assigned to represent Owens at his preliminary hearing. R. 125 at 99-103. That report revealed

that Owens was asserting a potential alibi defense, namely that on the night of the murder, he was drinking with friends. *Id*. at 70-71, 100-103; *see also* R. 140-2 at 2.

During the course of his representation of Owens, Rago made several requests to his investigator Noel Zupancic for the purpose of Owens's defense. Zupancic began working as an investigator at the Public Defender's Office in 1994. R. 126 at 6. Similar to the classification levels of attorneys, the Public Defender's Office employed several levels of investigators. According to Zupancic, an Investigator I served subpoenas, transported witnesses, and accompanied other investigators on their investigations whereas an Investigator II, which was what Zupancic was at the time of the Owens investigation, conducted witness interviews. *Id*. at 7, 43. An Investigator with a Level III classification handled more complex cases and could serve as a lead investigator in a case. *Id*. at 7. Around 2001, Zupancic became an Investigator III. *Id*. at 7-8.

Rago's first investigative request to Zupancic occurred around July 3, 2000. In that request, Rago asked Zupancic to accompany him to the crime scene—to observe the locale, its lighting conditions, and the positions of the surrounding buildings for the purpose of matching these details against the information in the police reports. R. 125 at 36-39, 76-78, 123-26; R. 126 at 9; *see also* R. 140-2 at 18. Rago made another investigative request to Zupancic around September 12, 2000 to locate potential alibi witnesses, Timothy Blackman and "Tasha" (last name then unknown), names Rago presumed he acquired from Owens, the individual, he said, who was best in the position to provide Rago with this information. R. 125 at 40-41;

R. 126 at 15, 35; *see also* 140-2 at 20. Based on his general practice at the time, Rago testified that as soon as he learned that Blackman and Tasha could be potential alibi witnesses, he would have acted immediately on that information because delayed action on those leads could prove detrimental to Owens's case. R. 125 at 127. Based on that general practice, Rago believed that since the investigative report indicated that he requested an investigation into Blackman and Tasha around September 2000, Owens must have given him the names of these witnesses around that time. *Id.* at 126-27. During Rago's conversations with Owens regarding his defense, Owens never mentioned Sheila Minor as a potential alibi witness to Rago. *Id.* at 60, 128. If Owens had done so, Rago said, he would have tried to locate her, like he did with Blackman and Tasha. *Id.* at 128.

During her investigation into Owens's alibi defense, around early November 2000, Zupancic tracked down an individual who she believed to be Blackman. *Id.* at 82-83, 134; R. 126 at 25-28; *see also* R. 140-2 at 21. Zupancic spoke with this individual, who identified himself as Blackman on the phone, and he told Zupancic that he "c[ould] not remember anything specific about the night of September 22nd, 1999" and that he "really c[ould] not say that he was with [Owens]" that night. R. 125 at 85, 134; R. 126 at 27-30, 51; *see also* R. 140-2 at 21-23. Blackman, however, told Zupancic that he regularly saw Owens during that time period. R. 125 at 85; R. 126 at 30. After this conversation, Zupancic and Blackman made further plans for an in-person interview, but Blackman failed to appear at the arranged time and

place, and did not return subsequent phone calls from Zupancic. R. 125 at 86, 134-36; R. 126 at 30-34, 52-53.

Pursuant to Rago's September 2000 investigative request, Zupancic also attempted to track down Tasha. R. 125 at 88-89, 136; R. 126 at 17, 19; *see also* R. 140-2 at 24-25. Around October 4, 2000, after going to the location she had for Tasha, Zupancic spoke with a man who she believed was Tasha's brother and obtained Tasha's last name (Dugar) and phone number. R. 126 at 17; *see also* R. 140-2 at 24. Zupancic later returned to that address on October 10, 2000, and encountered a woman outside the home who refused to identify herself. R. 125 at 89, 137; R. 126 at 18; *see also* R. 140-2 at 24. The woman told her that Tasha did not live at that address and that she did not know Tasha's current address. R. 125 at 90, 137; R. 126 at 17-18, 20-21; *see also* R. 140-2 at 24-25. Through further investigation, Zupancic learned that Tasha had a warrant out for her arrest. R. 125 at 90, 138; *see also* R. 140-2 at 24-25. Zupancic testified that she believed that the woman she met outside the house was likely Tasha. R. 126 at 22.

According to Rago, this was the extent of what his investigation revealed regarding Owens's potential alibi witnesses: a witness who he characterized as providing a less than definitive alibi and proved difficult to locate, and a witness who they could not locate at all. R. 125 at 139. Indeed, when asked why he did not present an alibi defense, Rago provided several strategic reasons: (1) Blackman did not assist Owens with an alibi defense based on the information Rago received from Zupancic regarding her phone interview with him; (2) Zupancic could not locate

Tasha; and (3) Rago had received no other information from Owens on which to base an alibi defense or any names for any other potential alibi witnesses. *Id.* at 51-52. Based on the information available to him at the time, Rago decided that his trial strategy for Owens's case was not to present an alibi defense but instead to attack the credibility of the two eyewitnesses who were going to testify that they saw Owens commit the murder. *Id.* at 149.

Timothy Blackman testified that he and Owens were childhood friends. *Id.* at 205. Around the time of the murder, they saw each other fairly regularly at either Blackman's mother's house or Tasha's house where they would drink and play cards. *Id.* at 205, 208-10. Blackman began his testimony by stating that he remembered being with Owens on September 21, 1999 at his friend Manny Jones's birthday party. *Id.* at 206-07. He also remembered assembling a table with Owens and Sheila Minor at Minor's house one evening and staying overnight there. *Id.* at 213-20. According to Blackman, he and Owens arrived at Minor's home around 7 p.m. and returned back to their homes the next morning around 7 a.m. *Id.* at 218-19, 221. Blackman said that he learned that Owens had been charged with murder when he heard other people in the neighborhood talking about it and he read about it in the newspaper. *Id.* at 225. But he never reached out to tell anyone—police, Owens, or Owens's counsel—that he may have been with Owens on the night of the murder because ultimately he was not certain of the day that he was actually with Owens. *Id.*

On cross-examination, Blackman began by testifying that he believed that he was with Owens on September 22, 1999. *Id.* at 233. But he then admitted that he really did not remember which night he went to Sheila Minor's house. *Id.* at 236-37. He remembered celebrating Manny's birthday with Owens on September 21st, but he ultimately could not even recall what year that occurred. *Id.* at 237-38. Later during cross-examination, Blackman again stated that he thought he partied with Owens on September 21st and assembled the table with Owens and Minor on September 22nd. *Id.* at 268. But he then stated again that he was not sure that he went to Minor's house on September 22nd. *Id.* at 268-69.

### B.    Court's Findings

The Court has carefully considered all of the documentary evidence presented at the evidentiary hearing and has considered the credibility of the witnesses who testified and the reasonableness of their testimony in light of other evidence. After considering all of this evidence, the Court finds the testimony of Rago, Zupancic, and Blackman credible, the testimony of Owens not credible, and the affidavits presented by Minor and Owens's mother suspect.

### C.    Deficient Performance

Where, as here, the Court reviews counsel's performance *de novo*, *see* 28 U.S.C. § 2243, the standard for judging counsel's representation remains a "most deferential one," *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011). The question under *Strickland* is "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from

best practices or most common custom." *Id.* (quoting *Strickland*, 466 U.S. at 690). In reviewing counsel's performance, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.

### 1.    Failure to investigate Tasha Dugar and other non-alibi witnesses

At the outset, the Court addresses Owens's claim that Rago was ineffective for failing to investigate a number of potential alibi witnesses, including Tasha Dugar and Owens's friends, Karee Williams, Jamil, Greg, Kenworth, and Will. R. 140 at 102-04. According to Owens, Zupancic's efforts to investigate Tasha as a witness were minimal and her attempts to find Tasha ended far too soon. *Id.* The Warden argues that this aspect of Owens's ineffective assistance claim is procedurally defaulted because it was not raised in one complete round of state court review. R. 150 at 10. Owens failed to respond to this argument.

In his postconviction proceedings, Owens alleged solely that Rago was ineffective for failing to investigate and call Minor and Blackman as alibi witnesses. R. 152-2 at 43-48. He did not mention counsel's omission regarding any other alibi witnesses. *Id.* It is well-established that failure to allege a specific factual basis for

an ineffective assistance claim in one complete round of state court review results in that particular factual basis being procedurally defaulted on federal habeas review. *See, e.g., Pole v. Randolph*, 570 F.3d 922, 934-35 (7th Cir. 2009) ("[I]f a petitioner fails to assert in the state courts a particular factual basis for the claim of ineffective assistance [in one complete round], that particular factual basis may be considered procedurally defaulted."); *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007) ("[T]he failure to alert the state court to a complaint about one aspect of counsel's assistance will lead to procedural default."). Until this proceeding, Owens never asserted counsel's failure to investigate Tasha and Owens's other potential alibi witnesses as a separate factual basis for a *Strickland* claim. Because this specific factual basis was not fully and fairly presented to the state courts in one complete round of state court review, it is procedurally defaulted. *See id.*

And even if this factual basis were not defaulted, it lacks merit in any event. Even Owens acknowledged at the hearing that he was not with Tasha or any of his other potential "alibi" witnesses at the time of the murder. According to Owens, on the afternoon of September 22, 1999, he saw Tasha at 3 p.m., and Karee, Jamil, Greg, Kenworth, and Will around 5 p.m. at Tasha's house. R. 126 at 129-32. None of these witnesses, as Owens now admits, would have provided an alibi for him for the time of the murder, which occurred at 8:30 p.m., *see id.* at 229, at which time Owens was purportedly with Blackman and Minor. Thus, even if counsel was deficient for curtailing his investigation into Tasha and for failing to sufficiently investigate Owens's other identified friends, Owens can certainly not demonstrate any

prejudice by counsel's omissions in this regard given Owens's admission that these witness would not have been able to provide exculpatory testimony at trial.

## 2. Failure to investigate Minor and Blackman as potential alibi witnesses and failing to call them to testify at trial

Turning to the other factual bases of Owens's ineffective assistance claim, Owens claims that Rago was ineffective for failing to investigate Minor and Blackman as potential alibi witnesses and further by failing to call them as alibi witnesses at trial. But the evidence adduced at the evidentiary hearing demonstrates that the investigation Rago conducted into Blackman and Minor was within the bounds of reasonable professional judgment and not deficient under *Strickland*.

Beginning with Rago's investigation into Minor, Rago admitted at the evidentiary hearing that he conducted no investigation into Minor. Rago explained that the reason for this omission was because Owens never told Rago that Minor was a potential alibi witness. R. 125 at 60 ("That name never came to us."); *id.* at 128 ("If we had been given a name Sheila Minor, yes. Just as we did with these two [Blackman and Tasha], we certainly would have tried to find Sheila Minor too."); *id.* ("Never knew of a Sheila Minor, never."). Had Owens done so, Rago claimed, Rago would have attempted to locate her like he did with the witnesses Owens actually identified—Blackman and Tasha. *Id.* at 128. Rago acknowledged that Owens asserted a potential alibi defense soon after he was arrested for Nelson's murder. *Id.* at 182-83. The initial alibi was that Owens was drinking with friends at the time, not that he was with Blackman and Minor at Minor's house, his current alibi

defense. But according to Rago, Owens only told him about two potential alibi witnesses: Blackman and "Tasha." *Id.* at 51-52. From Rago's perspective at the time, all he knew regarding a potential alibi for Owens was that Owens was with Blackman and Tasha at Tasha's house between 5 and 10 p.m. on the night of Nelson's murder. Based on that information, Rago instructed his investigator, Zupancic, to locate and interview them. Indeed, Rago's testimony in this regard is credible given the records in the Public Defender's investigative files. Minor's name, unlike Blackman and "Tasha's" names, was nowhere in those records. Given that Blackman and Tasha were in the investigative records, if Owens had, in fact, told Rago about Minor, then her name would have been in the records too. It is not. Because Owens never identified Minor to Rago as a potential alibi defense—an assertion from Rago that the Court finds to be supported by Rago's testimony regarding his past practices and thus credible—Rago cannot be said to have rendered deficient performance for failing to investigate (and call to testify) a potential witness about whom Owens had not made him aware.

As for Rago's investigation into Blackman, the Court finds that investigation to be constitutionally reasonable. After Owens identified Blackman as a potential alibi witness, Rago instructed Zupancic to locate and interview him. Zupancic spoke with Blackman on the telephone, and he told her that while he was friends with Owens and that he regularly saw Owens, he could not recall whether he was with Owens on the night of the murder. Zupancic made further arrangements to follow-up on this conversation with a face-to-face interview, but Blackman failed to appear

where the two had arranged to meet. Following this missed appointment, Zupancic made further efforts to find Blackman until the week before Owens's trial, but these efforts proved unsuccessful. Rago stated that it would have been his general practice to ask for Owens's assistance in contacting Blackman since Blackman was proving uncooperative. R. 125 at 53. These efforts to investigate Blackman's potential as a witness were reasonable under the circumstances known to Rago at the time. Finding Blackman uncooperative and given the uncertainty regarding his potential testimony, counsel instead of pursuing the Blackman lead reasonably chose to focus on attacking the credibility of the State's two eyewitnesses. The Court cannot say that counsel was deficient for pursuing this option where it cannot be said that Blackman possessed any exculpatory information.

Nor was Rago deficient for failing to call Blackman to testify at Owens's trial given the testimony Blackman likely would have given. At best, Blackman would have testified that he was not sure whether he was with Owens on the night of the murder. At the evidentiary hearing, Blackman initially thought he remembered being with Owens on September 21, 1999 because his friend, Manny, had a birthday party that night, and he remembered being at that party with Manny and Owens. And he recalled spending the following night with Minor and Owens assembling Minor's furniture. But Blackman later testified that he could not be sure even what year Manny's birthday party took place. Ultimately, Blackman could only definitively say that there was a night when he celebrated Manny's birthday with Owens and another night when he and Owens spent the night at Minor's home. But

he could not say for certain what night that was. That was the reason, Blackman said, that he never reached out to Owens's defense attorney because he was not sure that he was with Owens that night. Blackman's potential testimony does not establish that he was with Owens at the time the murder took place, and his weakness as a potential witness was highlighted by the Court's questioning at the hearing:

Q [the Court]:    So it's clear, you believe your friend Manny's party was on September 21st because that's his birthday.

A [Blackman]:    Mm-hmm, correct.

Q:    You're not sure of the year of it that—well, putting two events together.

A:    Right.

Q:    There's Manny's birthday, and there's a night you put a table together in Sheila's house, correct?

A:    Correct.

Q:    Do you know if the putting the table together at Sheila's house occurred after the night of the birthday party?

A:    I'm not a hundred percent sure.

\*\*\*

Q:    All right. And do you know what year you put the table together at Sheila's house?

A:    Not exactly sure.[8]

---

[8]  Owens makes the argument that Blackman could not say with certainty that he was *not* with Owens at the time of the murder. Such testimony would not have been helpful at Blackman's trial. The only helpful testimony would be if Blackman could affirmatively testify that he *was* with Owens at the time of the murder. Blackman could not so testify.

R. 125 at 277-78. The uncertainty at the hearing was not the result of the passage of time. Zupancic testified that Blackman was similarly uncertain when she interviewed him years earlier.[9] Counsel cannot be said to have been deficient by failing to present such ambivalent testimony at Owens's trial for such testimony would not have helped Owens's defense.

Moreover, in light of the testimony presented at the hearing and due to her bias and familial relation to Owens as his mother, the Court finds the averments in Bertha Marie Owens's two affidavits regarding counsel's investigation to be incredible. *See e.g.*, *Johnson v. Loftus*, 518 F.3d 453, 457 (7th Cir. 2008); *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005). Ms. Owens indicated that she told Rago that Blackman and Minor wanted to testify about an alibi defense and that she gave him both their numbers and contact information, but Rago failed to interview them or investigate the defense, despite assurances that he would. R. 152-2 at 59-60, 106. But at the evidentiary hearing, Rago denied that this occurred, because if Ms. Owens had, in fact, given Rago this information, he would have immediately acted on it. R. 125 at 162-64. Moreover, Blackman acknowledged during his testimony that he never told Owens's mother that he wanted to testify at Owens's trial. *Id.* at 263-64.[10] Based on Rago's and Blackman's demeanor at the hearing, the Court finds their testimony on these points to be credible. On the other

---

[9]  Blackman provided different information in the affidavits attached to Owens's postconviction petitions. But Blackman's testimony at the evidentiary hearing effectively disavowed the averments in those affidavits.

[10]  Blackman acknowledged later in his testimony that Owens's mother asked him if he would testify for Owens if it became necessary. R. 125 at 278.

hand, the Court finds Ms. Owens's statements in her affidavit suspect. In particular, the Court finds credible Rago's testimony that if he had been given Minor's name as an alibi witness, either from Owens or Owens's mother, he would have investigated it, just as Blackman and Tasha were investigated.

### 3. Overall Representation

In the end, Owens received constitutionally adequate representation. In evaluating counsel's representation, the federal habeas court examines not only the lawyer's claimed error "(of omission or commission)," but evaluates the "entire course of the defense." *Williams v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009); *see also Richter*, 131 S. Ct. at 791 ("[I]t is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy."); *Pole*, 570 F.3d at 934 (stating that under *Strickland*, federal habeas court must "assess counsel's work as a whole, and it is the overall deficient performance, rather than a specific failing that constitutes the ground for relief") (internal quotation marks omitted).

An analysis of Rago's overall representation here reveals that in addition to investigating Blackman, counsel investigated the other potential alibi witness Owens identified prior to trial. Zupancic was able to identify "Tasha" as Tasha Dugar and made multiple (though unsuccessful) attempts to track Tasha down. Counsel also visited the crime scene with Zupancic to gather information that would assist him in challenging the credibility of the State's eyewitnesses. Also, as part of Rago's representation, he subpoenaed documents from the Markham Police

Department, R. 125 at 106-07; *see also* R. 140-2 at 4-5, and when the Department did not timely comply with that subpoena, Rago filed a successful petition for rule to show cause, R. 125 at 109-11; *see also* R. 140-2 at 6-9. Even though Rago was entitled to these materials under Illinois law, Rago testified that he subpoenaed them to make sure that he had access to them as early in the process as possible so he could act on any pertinent information in them. R. 125 at 108. Rago also filed a motion to preserve evidence so that any evidence the police possessed would not be destroyed or misplaced. R. 125 at 109; *see also* Resp. Exhs. 2 & 3. After Rago received the materials from the police, Rago consulted with Owens who would have told him the basis on which to file a motion to quash arrest, which counsel filed. R. 125 at 112-13; *see also* R. 140-2 at 13. Rago further filed a formal motion for discovery so that he received information from the State more quickly. R. 125 at 115; *see also* R. 140-2 at 10-12.

Further, at trial, counsel advanced a reasonable doubt defense, attacking the testimony of the State's eyewitnesses. Rago impeached Johnnie's eyewitness testimony with: (1) his failure to immediately notify police after the murder occurred—he did not speak with police when he returned to the liquor store from the hospital, and indeed did not speak with police until six days later; (2) the inconsistencies between Johnnie's description of Nelson's assailant and Owens's actual appearance; and (3) the suggestiveness of the photo array from which Johnnie identified Owens—Johnnie described the attacker as "big and bulky" and agreed with counsel's characterization that Owens was the "biggest and the

bulkiest" person in the photo line-up. R. 152-1 at 142. Rago elicited on cross-examination of Detective White that Owens was the only individual in both the photo array and the lineup. *Id.* at 145. And Rago further brought out inconsistencies between Evans's account of the events and Johnnie's account, *id.* at 159-60, R. 112-1 at 109-10, and Evans's prior criminal history and the deal he made with the State for his truthful testimony, R. 112-1 at 81-84. Rago also forcefully stressed the credibility issues regarding Johnnie and Evans in his closing argument. *Id.* at 100-17. And finally, after Owens was found guilty, Rago filed a motion for new trial in which counsel raised numerous grounds for relief. R. 140-2 at 28-30.

Owens questions Rago's belated attempt to investigate Blackman as a potential witness and for curtailing that investigation when Blackman proved uncooperative. According to Owens, Rago was on notice three days after Owens's arrest that Owens had a potential alibi, but Rago waited nearly ten months before attempting to locate him. Owens also claims that Zupancic's efforts to locate Blackman were minimal, citing Zupancic's acknowledgment that she could have done more to locate Blackman after their failed in-person meeting. But accepting Owens's first argument would require the Court to credit Owens's speculative testimony that he gave Rago actionable information before Rago asked Zupancic to locate and interview Blackman and Tasha and that Rago then failed to act on it. Instead, the Court credits Rago's testimony that it was his general practice to have acted on such information immediately, and if the reports reflected no action on his

part, that was because Owens had failed to pass that information to him. *See Williams*, 557 F.3d at 540. Rago cannot be faulted for failing to act on information that he was not given.

Owens's post-trial correspondence to Rago supports Rago's testimony in this respect. In the Court's view, those detailed and well-written letters demonstrated that they were written by an intelligent individual. In those letters, Owens sets forth what he perceived to be weaknesses in the State's case and numerous (non-frivolous) bases for a motion for a new trial. R. 126 at 141-47, 149-52. Notably, nowhere in those letters did Owens express dissatisfaction with Rago's failure to call Minor as a witness—indeed, nowhere is Minor even mentioned—and only one time is Blackman even referenced. *Id.* In fact, Owens's post-trial letters were generally complimentary to Rago in his evaluation of Rago's efforts. *Id.* at 141 ("Mr. Rago, I would like to truly commend you on your valiant effort on defending me."). Given these letters, the Court does not credit Owens's testimony that Owens provided actionable information regarding his alibi defense that Rago ignored.

And even if it were true that Rago and Zupancic could have done more to locate Blackman and they were deficient in this one respect, that one deficiency does not render their overall work for Owens deficient. *See Williams*, 557 F.3d at 538. Ultimately, Rago believed that based on the (reasonable) efforts they had made to investigate Owens's alibi defense, Owens did not have a viable alibi defense. Blackman's potential testimony did not provide Owens a definitive alibi for the night of the murder and thus would not have aided Owen's alibi defense, and

Blackman was proving uncooperative. Nor were Rago and Zupancic able to locate Tasha, Owens's other proposed alibi witness. R. 125 at 49, 139. And Rago and Zupancic received no other information from Owens regarding any other potential alibi witness. *Id.* at 49-52. At that time, Owens made no mention of Minor. Rago acknowledged that without the testimony of these witnesses, he could still have presented an alibi defense based on Owens's testimony that he was not at the crime scene and provided he could locate him, the testimony of Blackman who would have testified to his version of the alibi defense. *Id.* at 139. And true, a reasonable doubt defense and an alibi defense are not inconsistent defenses. But instead of presenting both defenses, Rago reasonably made a strategic decision to focus on attacking the credibility of the State's two eyewitnesses, which he did fairly effectively, despite the ultimate conviction. *Id.* at 49, 139. Based on the testimony presented and the present record, it cannot be said that this decision was deficient under *Strickland*.

### D. Prejudice

Even if Rago's omissions constitute deficient performance, Owens has failed to demonstrate *Strickland* prejudice. In assessing prejudice, "[i]t is not enough to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "*Strickland* asks whether it is 'reasonably likely' the result [of the trial] would have been different." *Richter*, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 696). To make this showing, Owens need not simply demonstrate that counsel's deficient conduct "more likely than not altered

the outcome" in the case, but rather "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792.

As discussed above, Blackman could not provide an alibi for Owens on the night of Nelson's murder because Blackman could not recall if he was with Owens that night. If Blackman, one of Owens's good friends, had offered the same equivocal testimony he offered at the hearing at Owens's trial—and from what counsel knew at the time from Zupancic's telephone conversation with him, that seemed a likely possibility—there is no reasonable probability that Owens would have been acquitted given the evidence that was presented in support of Owens's guilt. Indeed, Blackman's ambivalent testimony must be considered weak when compared to the evidence the State marshaled at Owens's trial. At trial, Johnnie and Evans both positively identified Owens as Nelson's murderer, and their accounting of the event was fairly consistent with each other. Johnnie testified that he saw Owens hit Nelson from a few feet away, and at a time when it was not yet totally dark and the area in front of the liquor store was illuminated by street lights and lights near the liquor store's front doors. He also saw Owens's face immediately prior to and after the attack. Johnnie's post-attack description of the offender and his clothing was consistent with Owens's actual appearance and Evans's testimony regarding Owens's appearance that night. Shortly after Nelson's murder, Johnnie selected Owens's photo from a photo array as the murderer, and he identified Owens in both a lineup and in court, expressing a high level of certainty in his

identifications. R. 152-1 at 161-63 (state appellate court's analysis of the reliability of Johnnie's eyewitness identification).

Add to that Evans's testimony that on that evening, there was sufficient light to see the events in question, and his identification of Owens as Nelson's murderer. True, he twice identified the wrong photo when asked to select the photo of Owens from the photo array that he viewed at the police station, but he successfully identified Owens from a photo of the lineup that he viewed at the police station after Owens's arrest, when he identified Owens to police as the murderer.

Accordingly, given this evidence, even if counsel had presented Blackman's testimony, it cannot be said that given the evidence demonstrating that Owens killed Nelson, there is a reasonable probability that the result of Owens's trial would have been different. *See Brady*, 711 F.3d at 828 (holding that failure to present "marginally exculpatory" testimony did not prejudice habeas petitioner).

In the end, Owens received the constitutionally effective counsel that he was entitled to receive under the Sixth Amendment and the Court makes the following findings:

- Owens failed to argue to the state courts in one complete round of state court review that counsel was ineffective for failing to investigate Tasha and other potential alibi witnesses. And regardless of whether the claim has been properly preserved for federal habeas review, there is no reasonable probability that the result of Owens's trial would have been different had Tasha's testimony or the testimony of the other "alibi" witnesses had been presented. Even Owens testified at

the hearing that all of these "alibi" witnesses (Tasha, Karee Williams, Jamil, Greg, Kenworth, and Will) only placed Owens at some location up to 5 p.m. or earlier, which does not aid an alibi for a murder that occurred at 8:30 p.m.

- Counsel did not render deficient performance when he failed to investigate Minor as a potential alibi witness because despite Owens's claim to the contrary, the Court finds Owens never told Rago about Minor. Rago could not have been deficient for failing to investigate a witness of whom he was not aware.

- Counsel conducted a reasonable investigation into Blackman as a potential alibi witness, and when Blackman proved uncooperative and revealed that he had, at best, marginally exculpatory testimony, counsel reasonably decided to focus his efforts on presenting a reasonable doubt defense and attacking the credibility of the State's eyewitnesses. Nor can Owens demonstrate that he would have been acquitted had counsel called Blackman to testify at trial given his equivocal testimony.

- Finally, despite Owens's claim of the insufficiency of Rago's representation, an examination of counsel's overall efforts reveals that the work Rago performed for Owens, while perhaps curtailed in some respects, cannot be deemed deficient under *Strickland*. Nor did Owens suffer prejudice from counsel's omissions given the ambivalent testimony Rago is faulted for not presenting and the evidence presented in support of Owens's guilt at trial.

## II.    Counsel's Advice to Owens Regarding Owens's Right to Testify

### A.    Factual Background

At the evidentiary hearing, Owens testified that at one or two meetings before trial, he told Rago that he wanted to testify that he was not at the scene of the murder. R. 126 at 120. Owens said that he had another discussion with Rago during the trial about testifying, but Rago told him that given William Evans's "botched" testimony regarding the photo array identification, Owens's testimony was unnecessary. *Id.* at 121-22. According to Owens, Rago never explained why Owens should not testify, nor was there any other discussion with Rago regarding his right to testify. *Id.* at 122, 126-27. But yet he agreed to follow Rago's recommendation that Owens not testify. *Id.* at 122-23. The trial judge also, Owens claimed, never asked him whether he wanted to testify. *Id.* at 123.

During cross-examination, Owens admitted that Rago simply recommended that he not testify and that Owens followed Rago's recommendation. *Id.* at 206-07. He further added during questioning by the Court that Rago never absolutely told him that he could not testify or that Owens had no right to testify, but Owens inferred from Rago's discouraging him from testifying that he should not testify; Owens nevertheless insisted that he did not know that he would have been allowed to testify if he had wanted to. *Id.* at 222-25. He acknowledged, however, that in his post-trial correspondence to Rago he never mentioned that Rago prohibited him from testifying or that he had wished to testify. *Id.* at 148, 152-53; *see also* R. 140-3 at 4-10. Owens also admitted that he had a stepfather who was a criminal defense

attorney, R. 126 at 98, 215-16, and that Owens, through a number of misdemeanor and felony arrests, had prior experience with the criminal justice system, *id.* at 184-87.

Rago testified that he did not specifically recall advising Owens regarding his right to testify at trial, but his general practice would have been to discuss that right with a client multiple times during the course of his representation. R. 125 at 60, 153. Rago said that he would have even specifically advised Owens of that right after the State rested its case and before the defense rested theirs. *Id.* According to Rago, the general practice of the trial judges at the Markham County courthouse was to admonish criminal defendants of their right to testify, but if a trial judge omitted that admonishment, then either the prosecutor or Rago would remind the judge to ask the defendant about it. *Id.* at 65. Although Rago acknowledged that the record did not reflect an on-the-record admonishment of Owens regarding his right to testify, Rago believed that the trial court admonished Owens of his right to testify off the record.[11] *Id.* at 63, 187.

Rago reiterated that when representing clients, he would advise them of their right to testify and further advise them that the decision to testify was theirs. *Id.* at 154. Thus, if Owens had demonstrated a desire to testify, Owens would have testified. *Id.* at 150 ("If [Owens] wanted to testify, I would not block him in any way, shape, or form."), 151 ("The ultimate decision [of] whether or not [Owens] [would]

---

[11] The Court finds Rago's testimony in this regard somewhat perplexing. But although the Court does not credit Rago's recollection regarding the trial court's off-the-record admonishment to Owens regarding his right to testify, that does not change the result here.

testify rests with him."); 154 (stating the client gets the "final say" on whether he testifies at trial). Rago denied that he ever forbid Owens from testifying. *Id.* at 155.

## B. *Strickland* Claim

Owens's claim regarding his right to testify has evolved since his state court litigation. On direct appeal, Owens argued that Rago "failed to allow [him] to testify" and "did not put [him] on the stand to testify on his own behalf." R. 152-1 at 37-38. In his postconviction petition, Owens alleged that he received ineffective assistance when Rago "would not allow [Owens] to testify at trial." R. 152-2 at 25. According to Owens's state petitions, Rago "forbid [him] [from] testify[ing] [on] his own behalf." *Id.* at 36. Owens elaborated on this claim with his own affidavits in which he averred that "[a]lthough [he] felt [he] needed to testify at trial . . . Rago told [him] not to worry, meaning that [Owens] would be acquitted." R. 152-2 at 98. Owens alleged that neither Rago nor the trial judge explained to him that he had a right to testify at trial and that the decision regarding whether to testify was his. *Id.* And had he known it was his decision to testify, Owens says, he would have testified that he did not murder Nelson and that at the time, he was with Minor and Blackman. *Id.* To further support this claim, Owens presented the affidavit of Owens's mother in which she stated that she informed Rago on several occasions that Owens wanted to testify about his alibi defense, but that Rago decided not to "allow" Owens to testify because the State's case against Owens was "so weak . . . that he would never get convicted." *Id.* at 59-60. Owens then brought the claim raised in his state court proceedings in this federal habeas proceeding, claiming

that Rago forbade him from testifying and that neither Rago nor the judge explained that the decision to testify was his alone to make.

Owens now argues in his post-hearing brief that although Rago "never specifically told [him] not to testify, the import of his legal opinion was such that [Owens] believed that he could not testify." R. 140 at 113. Thus, it seems from Owens's post-hearing brief and his testimony at the evidentiary hearing that Owens claims now not that counsel prevented him from testifying at trial, but that counsel discouraged him from testifying, and that this advice amounted to ineffective assistance of counsel.[12] *Id.* at 113-14. The Warden argues that Owens's claim regarding his right to testify, as now formulated, is procedurally defaulted because Owens never argued to the state courts that, while he made the ultimate decision whether to testify, counsel's advice to him regarding testifying amounted to constitutionally deficient advice. R. 150 at 19. Owens failed to respond to the Warden's argument.

"A state petitioner seeking a writ of habeas corpus in federal court must first exhaust the remedies available to him in state court, thereby giving the State [courts] the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Cheeks v. Gaetz*, 571 F.3d 680, 685 (7th Cir. 2009) (internal citation and internal quotation marks omitted). To afford the state courts this opportunity, a habeas petitioner must fully and fairly present his constitutional claim to the state

---

[12]  Owens's earlier claim that he did not know that he had the right to testify is belied by the testimony he gave at the evidentiary hearing. According to Owens, he agreed to Rago's recommendation that he not testify, meaning that he necessarily was aware of his right to testify. R. 126 at 206-07.

courts before seeking relief in federal court. *Gray v. Hardy,* 598 F.3d 324, 327 (7th Cir. 2010). Fair presentment of a federal claim to the state courts contemplates presentment of both the claim's operative facts and controlling legal principles. *Gonzales v. Mize*, 565 F.3d 373, 380 (7th Cir. 2009).

Here, the operative facts underlying Owens's current claim—counsel misadvised Owens not to testify or gave him advice which wrongly influenced his decision not to testify—are wholly different than the operative facts underlying Owens's original claim—counsel forbade or prevented him from testifying. The state courts were never presented with the operative facts that form the basis of the claim that Owens currently advances, and thus never had a full and fair opportunity to address Owens's claim that counsel's advice regarding Owens's decision whether to testify was ineffective assistance under *Strickland*. Accordingly, Owens's presentment of his current claim for the first time in the Court and failure to present the claim's operative facts at all in the state courts renders it procedurally defaulted on federal habeas review.

But even if the Court were to evaluate Owens's current claim on the merits, it lacks merit in any event. "[I]ncorrect advice that induces a defendant to waive his right to testify can constitute ineffective assistance." *Starkweather v. Smith*, 574 F.3d 399, 403 (7th Cir. 2009) (emphasis omitted). To prevail on this claim, Owens must demonstrate that counsel's advice fell below an objective standard of reasonableness, and that there is a reasonable probability that had Owens testified he would have been acquitted of murder. Owens can show neither.

Owens testified that prior to trial, he told Rago about his desire to testify, and Rago stated his opinion that Owens need not testify given the weaknesses in the State's case. R. 126 at 120, 206. Rago at no time told Owens that he could not testify. *Id.* at 222. Owens trusted counsel's judgment, agreed to follow Rago's recommendation, and decided not to testify. *Id.* at 207. Owens testified that during the trial, he again discussed his right to testify with Rago, and at that time, Rago recommended that Owens need not testify, particularly given Evans's "botched" photo array selection. *Id.* at 121. Owens again agreed to follow Rago's recommendation, believing that his testimony was not critical evidence given the State's evidence, and in none of his post-trial correspondence with Rago did he mention that he had wanted to testify or that he disagreed with counsel's recommendation that he not testify. *Id.* at 122-23, 222.

There is no indication from Owens's testimony that Rago misinformed him of his rights or his chances of acquittal. Indeed, Rago testified that he would never have predicted an outcome of a trial to a client. R. 125 at 148 ("I never, ever predict an outcome regarding either a jury trial or a bench trial with my clients."). Thus, the Court is left with Owens's allegations that counsel advised him not to testify and pursuant to that recommendation, Owens decided not to testify. Even assuming Rago advised Owens against testifying, Owens has not demonstrated that this advice would have been objectively unreasonable under the circumstances as they existed at the time. Rago may have believed that it was better strategy to focus Owens's defense on aggressively attacking the credibility of the State's eyewitnesses

by challenging the reliability of their identifications. *Id.* at 149; *see also* R. 112-1 at 100-17 (Rago's closing argument). Or he may have believed the State's case was weak, particularly after Evans's testimony regarding the photo array, and decided to rely on that trial strategy rather than also running the risk of Owens's testifying and relying on Owens's uncorroborated alibi defense. Such a decision was not unreasonable and outside the bounds of reasonable professional assistance. *See United States ex rel. Parker v. Chandler*, No. 09 C 4321, 2011 WL 221834, at *10 (N.D. Ill. Jan. 24, 2011).

Nor can Owens demonstrate that he has met *Strickland*'s prejudice requirement. Even if Owens had testified that he was not present at the scene at the time of the murder, there is no reasonable probability that he would have been acquitted. His alibi was uncorroborated—Blackman would not have been able to confirm Owens's whereabouts at the time of the murder. Johnnie and Evans testified that they saw Owens commit the murder, and despite Rago's attempts to discredit their identifications, the trial court found their testimony credible. It cannot be said that if Owens's unsupported and self-serving testimony that he was with friends that night had been presented that would have resulted in the trial court's acquittal of Owens for Nelson's murder. Because Owens cannot demonstrate either counsel's deficient performance or prejudice resulting from counsel's performance, Owens cannot prevail on his current claim regarding his right to testify.

## III.    Certificate of Appealability

Because Owen's ineffective assistance of counsel claim lacks merit, his petition for a writ of habeas corpus is denied. Rule 11(a) of the Rules Governing § 2254 Cases provides that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To obtain a certificate of appealability, a habeas petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This demonstration "includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (internal quotation marks omitted); *see also Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011). And where a petition is disposed of based on a procedural bar, without reaching the merits of the underlying constitutional claims, a certificate of appealability should issue only if reasonable jurists would find the adjudication of the antecedent procedural ruling "debatable." *Slack*, 529 U.S. at 484-85; *see also Lavin*, 641 F.3d at 832.

The Court's earlier denial of Owens's inordinate delay and Fourth Amendment claims rests on well-settled precedent governing procedural default and the non-cognizability of these claims in § 2254 proceedings. The Court's further determination that Owens's claim regarding the state trial court's admission of the photo array and lineup identification was procedurally defaulted is not a conclusion that reasonable jurists could debate. Nor is the Court's rejection of Owens's

improper extrajudicial findings claim on the merits a finding that is debatable. Finally, the Court's denial of both grounds of Owens's ineffective assistance of counsel claim rests on well-settled precedent governing procedural default. Moreover, based on Rago's and Zupancic's credible testimony regarding their investigation into Owens's alibi defense, Blackman's credible testimony regarding the limited extent to which he remembered being with Owens the night of the murder, and Rago's credible testimony regarding his advising of Owens about his right to testify, Owens has not demonstrated that the application of *Strickland* to Owens's ineffective assistance claim presents questions that jurists of reason could debate should be resolved in a different manner. Accordingly, certification of any of Owen's habeas claims for appellate review is denied.

## Conclusion

For the foregoing reasons, Owens's petition for a writ of habeas corpus is denied, and the Court declines to issue a certificate of appealability for any of his claims.

ENTERED:

Thomas M. Durkin
United States District Judge

Dated: February 11, 2014